**CITY OF WACO v. DIAMOND et al.**
No. 1709—6240.

Commission of Appeals of Texas, Section A.
Nov. 28, 1933.

John McGlasson, City Atty., and Geo. W. Morrow, Asst. City Atty., both of Waco, for plaintiff in error.

H. O. Dabney and F. M. Fitzpatrick, both of Waco, for defendants in error.

CRITZ, Judge.

This suit was filed in the district court of McLennan county, Tex., by Mrs. W. L. Diamond and her husband, against the city of Waco, Tex., a municipal corporation, to recover damages for personal injuries sustained by Mrs. Diamond, as the result of slipping and falling on snow and ice in a public street in such city. Trial in the district court, where the case was submitted on special issues, resulted in a verdict and judgment for the Diamonds for $700 for personal injuries to Mrs. Diamond and for $50 doctor's bill. On appeal to the Court of Civil Appeals at Waco, the $700 judgment was affirmed after the Diamonds had filed a remittitur of the $50. Judge Alexander dissented. 46 S.W. (2d) 1049, 1053. The city brings error.

As above stated, the case was submitted to the jury in the district court on special issues. In response to such issues the jury found: (a) That Mrs. Diamond was injured on December 24, 1929, at the place alleged in her petition; (b) that the street where Mrs. Diamond was injured was not in a reasonably safe condition at the time of such injury; (c) that the city failed to exercise ordinary care in keeping said street in a reasonably safe condition at the time and place of such injury; (d) that the city, by the exercise of ordinary care, could have discovered the unsafe condition of the street in question a sufficient length of time prior to this accident to have enabled it, in the exercise of ordinary care, with the available means at its command, to remove said ice and frozen snow so as to make such street in a reasonably safe condition.

The jury also found that the above matters constituted negligence on the part of the city, and that such negligence was the proximate cause of Mrs. Diamond's injuries.

Also the jury acquitted Mrs. Diamond of all acts of contributory negligence alleged by the city.

The trial court failed to give a direct specific charge defining the burden of proof. He did, however, begin each question submitted with the words, "Do you find from a preponderance of the evidence." Then followed the question propounded. This is not only a proper way to indicate the burden of proof in special issue submissions, but it is the better way. Federal Surety Co. v. Smith (Tex. Com. App.) 41 S.W.(2d) 210.

The city seasonably and properly insisted in the two lower courts that there was no evidence in this record sustaining, or tending to sustain, the jury's findings of negligence against it, and such contention is presented to the Supreme Court by proper assignments. Before determining such issue, we deem it proper to announce certain rules of law which we think must govern in determining the same. These rules are:

(a) Negligence is the doing of something that a person of ordinary prudence would not have done under the same or similar circumstances, or the failure to do something that such a person would have done under the same or similar circumstances.

(b) Snow and ice, by themselves, without more, do not constitute a defect in a street or highway, and the liability of a municipality for injuries to travelers caused by accumulations of ice and snow on its streets depends upon whether or not it has been negligent. 13 R. C. L. p. 408, § 335. The city is only bound to exercise reasonable care to keep its streets reasonably safe for travelers who are using due care, and its liability depends upon what is reasonable under all the circumstances surrounding the case, paying attention to climatic conditions. Id.

(c) It may constitute negligence on the part of the city for it to allow snow or ice to accumulate in such a way, and to remain for

such a length of time as to constitute a nuisance or dangerous hazard. 13 R. C. L. p. 410.

■ The facts of this case are practically undisputed. In substance they show:

That on December 20 and 21, 1929, from eleven to fifteen inches of snow fell in the city of Waco, Tex.; that such snowfall was uniform throughout the city and surrounding territory; that immediately after the snow ceased to fall on December 21 it became very cold and the temperature dropped below zero; that thereafter, and up to and including December 24, the date of this accident, the temperature alternated between thawing during the day to freezing again at night, and that all during this time all of the many miles of the city's streets were covered with snow and ice except in such places as was cleared thereof by the city.

It further appears that the city of Waco is located in a vicinity where the general climatic conditions are such that the winters are generally mild, and, while the amount of snowfall and accompanying climatic conditions here involved were not absolutely unprecedented in the sense that they never before occurred, still such snowfall and accompanying climatic conditions were very unusual, and such that it was certainly not negligence on the part of the city to have been unprepared in men and equipment to fully cope with the conditions which existed as to its streets above shown.

It further appears that the city of Waco, which is a municipality of considerable population, has considerable trackage of street cars, and such trackage extends generally along the streets in the business district. At the street intersections in the business district where traffic is congested and many passengers get on and off the street cars, the city has provided safety zones. These safety zones are raised concrete platforms erected in the street alongside the street car tracks. They are some five or six inches above the general street level, some three and a half or four feet wide, and from twenty to forty feet long. There is a space or traffic lane between these safety zones and the opposite sidewalk where the general street traffic travels. This space was some twelve feet wide at this particular safety zone. It appears that it was the common practice for passengers alighting from street cars onto these safety zones to walk across to the sidewalk from any point therefrom.

It is further shown that on the morning of December 24, 1929, while the streets generally throughout the city of Waco were still covered with snow and ice, Mrs. Diamond left her home to go to the business portion of the city. She traveled by street car in so doing. When the street car on which Mrs. Diamond was riding arrived at Sixth and Austin streets, she alighted therefrom onto one of the above-described safety zones there located, and which was then free from ice and snow on its top surface. Mrs. Diamond then started to walk from the safety zone from a point not at the end thereof directly across to the sidewalk, and as she stepped off such zone her foot or feet slipped on the ice, causing her to fall. Her arm was broken as the result.

It is further shown that at the time of this accident the snow in the street where Mrs. Diamond attempted to cross had frozen until it was a solid block of ice against the safety zone, angling from at or near the top of such zone, and sloping towards the sidewalk. Mrs. Diamond had ridden the street cars many times and usually went across this and other safety zones in the same manner, and about the same place as on the occasion of this injury.

As already shown, the city of Waco is located in a vicinity where the winters are mild, and where snowfalls and weather conditions such as this are unusual. Under such circumstances, it was inadequately equipped with men and machinery to meet the extraordinary street conditions produced by so much snow and ice, and attendant unusual weather conditions.

At the time of this snowfall, the city had about 50 men in its street force. The city had other departments, and it appears that it had about 85 men working in all. Some of these men worked on street sprinklers, some in the parks, and some on the streets.

The snow in question here began falling on Friday and ceased the next day, Saturday. On Saturday it was very cold, and something like half of the men working for the city did not come to work. It then appears from the testimony of the city street superintendent, who is uncontradicted and unimpeached, that he started his men to clearing the street intersections at about 10 o'clock on Saturday morning. In doing this he used all of the men he could call and those who reported for work. The city continued from this time to use all available men and means to clear its street intersections of snow and ice. In doing this some of the men worked for sixteen hours, and in doing so worked at night. One of the first streets where the work started was the one where this accident occurred. The city continued its work until the streets were free of ice and snow, using all of the men it could hire.

From the foregoing we are forced to the conclusion that the city did all that reasonably could have been expected of it to relieve the general conditions of snow and ice existing on its streets. It certainly was not called on to remove all snow and ice therefrom.

As we understand the opinion of the Court of Civil Appeals, it, in effect, holds that there is evidence of probative force in this record showing, or tending to show, that the city was guilty of negligence in allowing snow and

ice to accumulate against the safety zone in question here so as to slope from about its surface to the level of the street, and to remain at such point for such a length of time as to constitute a nuisance and dangerous hazard. We are unable to agree with such holding.

As shown above, it may constitute negligence for a city to allow snow and ice to accumulate in such a way and to remain for such a length of time as to constitute a nuisance and a dangerous hazard. In this record, however, the city is only required to exercise ordinary care. Certainly mere proof that the accumulation existed at the time of the accident, and produced the same, would not justify convicting the city of negligence either in allowing such accumulation to form, or in permitting it to remain an unreasonable time after formation.

■ When we come to examine this record, we are compelled to agree with Judge Alexander's dissenting opinion to the effect that there is no evidence in this record showing, or tending to show, that the city was guilty of negligence in allowing this accumulation to form or in permitting it to remain after it accumulated. In this connection we approve and adopt the following from such dissenting opinion:

"Immediately after the snow ceased to fall on the previous Saturday it became very cold, the temperature dropping below zero, but thereafter the temperature alternated between thawing in the daytime and freezing at night. At the time of the accident on Tuesday morning there was unfrozen slush between the ice near the safety zone and the curb. There is nothing in the record to show when the ice and snow that caused the fall accumulated at the place of the accident. The space between the safety zone and the curb was a traffic lane used by automobiles. This snow may have fallen at the place of the accident three days prior thereto and remained there until plaintiff was injured, or the snow that fell at the place of the accident may have melted or been removed and other snow carried to the place of the accident by passing vehicles the night before the injury. If the latter condition existed, then certainly the time in which the city was required to discover and remove the snow did not begin until the snow had been placed there by passing vehicles and had frozen in a dangerous heap, and the city would be entitled to a reasonable time thereafter in which to discover the unusual danger, if any, and to remove the same. Neither is there any evidence to show when the snow that caused the fall became frozen and slippery, nor when it became heaped into such a position as to be

dangerous. The vital question to be determined was whether the dangerous formation, if any, had existed sufficiently long to require the city to discover and remove same. The burden was on appellee to allege and prove such a state of facts. Such a condition cannot be presumed from the mere fact that the snow had ceased falling three days prior to the injury nor from the mere fact that the condition was possibly dangerous at the time of the accident. There is no evidence whatever on this question. The city was not required to remove ordinary snow and ice from the walk. Its duty to discover and remove same did not arise until the snow had become so heaped and frozen as to form a dangerous hazard. If the snow was soft and pliable the day before the injury, it did not constitute a dangerous obstruction and the city was not required to remove the same. There was no evidence that the city actually discovered the dangerous condition. The evidence could not be any stronger than the pleadings. The plaintiff alleged that the traffic between the safety zone and the curb 'worked said snow up to where it was moist and soft in the daytime and squeezed it up against the safety zone; * * * that during the night time said snow would congeal and freeze and become solid.' There is no evidence to support such allegations, but, if we were to accept same as true and were to find that the snow became frozen in a dangerous heap, as alleged, some time during the night prior to the accident, which occurred about 9:30 the following morning, the city would not have had time to discover and remove same prior to the accident, and therefore would not be guilty of negligence for its failure to do so. Vonkey v. City of St. Louis, 219 Mo. 37, 117 S. W. 733, 736; Armstrong v. City of Monett (Mo. Sup.) 228 S. W. 771, 774; Harrington v. City of Buffalo, 121 N. Y. 147, 24 N. E. 186; Reedy v. St. Louis Brewing Ass'n, 161 Mo. 523, 61 S. W. 859, 53 L. R. A. 805; Gist v. City of St. Joseph (Mo. App.) 220 S. W. 722; Wilson v. City of Clinton, 204 Iowa, 1183, 216 N. W. 698; Hyer v. City of Janesville, 101 Wis. 371, 77 N. W. 729; Kinney v. City of Troy, 108 N. Y. 567, 15 N. E. 728."

We recommend that the judgments of the district court and Court of Civil Appeals be both reversed, and the cause remanded to the district court.

CURETON, Chief Justice.

The judgments of the district court and Court of Civil Appeals are both reversed, and cause remanded, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.