**HERNDON et al. v. HALLIBURTON OIL WELL CEMENTING CO. et al.**

No. 4102.

Court of Civil Appeals of Texas. El Paso.
July 10, 1941.

Rehearing Denied Sept. 18, 1941.

Naman, Howell & Boswell, of Waco, and Dean B. Kirkham, of Corpus Christi, for Herndon and United Employers Casualty Co.

James B. Hubbard, Oscar Spitz, and Keys & Holt, all of Corpus Christi, for Bentex Oil & McMillian.

Ben F. Saye, of Duncan, Okl.; Vinson, Elkins, Weems & Francis, of Houston, Hart & Brown, of Austin, and Tarlton Morrow, of Houston, for Halliburton.

SUTTON, Judge.

This is a dual appeal from the 117th District Court of Nueces County. Ben L. Herndon, joined by the United Employers Casualty Company, the insurance carrier for his employer, Carmos Drilling Company, as plaintiffs (and they will be so designated here), sued the Halliburton Oil Well Cementing Company, Bentex Oil Corporation, and Lee McMillian, as defendants, generally referred to herein as Halliburton, Bentex and McMillian, to recover for personal injuries sustained by Herndon on July 22, 1937. The trial was to the court and jury; judgment was rendered on the verdict of the jury for the plaintiffs against Halliburton in the sum of $40,000, and in favor of Bentex and McMillian. From that judgment Halliburton has perfected this appeal, and the plaintiffs have perfected their appeal as against Bentex and McMillian.

The record is a very voluminous one. The statement of facts consists of 1,735 pages, the transcript 411 pages, and there are 318 printed pages of briefs and 242 typewritten pages. We are at once confronted with the task of keeping this opinion within due limits and at the same time giving a fair consideration to and a discussion of the questions presented.

Herndon alleges in his petition that on July 22, 1937, he was a man twenty-seven years of age, with a high school education and earning $7 per day; and on said date and prior thereto worked for the Carmos Drilling Company which, as an independent contractor, engaged in drilling an oil well for Bentex under a written contract; that Halliburton on said date was engaged as an independent contractor by Bentex to do a "squeeze job" for Bentex on Harmon Well No. 4, which was a highly specialized undertaking performed with specially patented equipment owned and operated by Halliburton, the operation of which required specially trained and skilled men; that the operation in the performance of the squeeze job is executed by applying great pressure through the use of engines and compressors to the closed casing of the well, and same created a situation of very great danger; that the job was being done by Halliburton and Carmos in the capacity of independent contractors in respect to Bentex; that certain phases of the job such as supplying steam, mud and mud pumps were performed by Carmos, and the remaining highly specialized phase of it was done by Halliburton; that McMillian was the general superintendent for Bentex and coordinator of the lease and squeeze job, but the details were all carried on and performed by Halliburton; that McMillian in the course of the squeeze job ordered Herndon under the derrick floor to look for leaks, and he (Herndon), being wholly ignorant of the operation and of any danger, went under it; that he discovered the casing was quivering and vibrating and shouted to the Halliburton man to shut down, which was not done, but the application of pressure continued, as a result of which the casing and pipes blew out of the well, and he was seriously and permanently mashed, crushed and injured.

Plaintiff's petition contained a rather detailed description of the whole undertaking, and alleged many acts of negligence, and among others specifically alleged that Halliburton and its employees engaged on the squeeze job were negligent in the failure of said employees to keep a proper lookout during said pressure test in respect to said casing and equipment. The petition further alleges such act of negligence in this language: "that said employees, each and both, failed to keep a careful and proper lookout for one in a position of danger such as this plaintiff."

As against Bentex and McMillian the petition alleged, among other specific acts of negligence, the following:

"(a) In directing the plaintiff to make the inspection as above set forth;

"(d) In failing to keep a proper lookout for danger upon sending plaintiff underneath said derrick;

"(g) In failing to request the operator of the Halliburton pumps to cut them off

before instructing Herndon to inspect for leaks."

The defendants each answered with general demurrers, numerous special exceptions, and general denials.

Halliburton specially denied that it was an independent contractor with Bentex, and alleged to the contrary that it had rented to Bentex its equipment and general employees for the purpose of doing the squeeze job under an agreement contained in what was designated a "work order." (While no executed copy of the work order was introduced in evidence, we think it may fairly be assumed, and that the evidence justifies the assumption, as was apparently assumed by the trial court and the parties, that such a work order was executed).

The defendants Bentex and McMillian specially pleaded that Herndon was a special employee of Bentex.

All the defendants pleaded various acts of contributory negligence, all of which were determined against them by the jury; assumed risk and latent defects in the casing and the manner of running same together, which were likewise determined by the jury adversely to them.

Halliburton has fifty-eight assignments of error and briefs fifty propositions of law, but does not undertake to specifically apply any of its propositions to any particular assignment or assignments of error. It groups its propositions under four group headings, as follows:

"Group No. 1.

"Propositions pertaining to the legal effect of the contract between Halliburton and Bentex.

"Group No. 2.

"Propositions pertaining to duty, negligence, causation and contributory negligence.

"Group No. 3.

"Propositions pertaining to misconduct of the trial court and counsel for plaintiffs.

"Group No. 4.

"Propositions pertaining to errors in the charge of the trial court."

We shall undertake to discuss and dispose of its phase of the appeal as grouped.

The plaintiffs on their end of the appeal have two assignments of error and one proposition. They are to one effect: That the evidence establishes as a matter of law that Carmos was an independent contractor at the time Herndon received his injuries, and with respect to Bentex was not a special employee.

The first point raised by Halliburton on its appeal is, the squeeze job it did for Bentex was not an independent undertaking as claimed by Herndon, but that it entered into a contract for hire with Bentex, under the terms of which contract it rented its equipment and men to Bentex, under whose direction and supervision the equipment and men were used and the relation of employer and employee obtained and not that of independent contractor. There are many cases on this subject in and out of Texas, many of which have been cited by the parties to this litigation, and entirely too many to be reviewed in this opinion. As has been said in Shannon v. Western Indemnity Co. et al., Tex.Com.App., 257 S.W. 522, at page 525, the diversity of opinion and the fact the courts have emphasized first one and then another of the evidential tests, decisions, except as showing the application of the general principles, are seldom of any controlling importance. The Shannon case, supra, is a leading Texas case and has been many times cited and approved. We think an application of the fundamental principles reiterated there will solve the question presented here.

The facts in this case show Halliburton maintains an office, men and equipment in most, if not all, the principal oil fields in the entire country suitable to do what is known among the oil production fraternity as a "squeeze job." The plaintiff says Halliburton engaged widely in this speciality. Halliburton objects to that statement and says it engaged in the business of "renting" its men and equipment for such business. What either says is not important, but what was actually done, is of primary importance. Halliburton insists its contract or work order, as it is called, is plain and unambiguous and fixes definitely the relationship as contended for by it. The work order is as follows:

"To Halliburton Oil Well Cementing Company:

"You are hereby requested to rent to Bentex Oil Co. (well owner or drilling contractor) your cementing equipment No. 369, and furnish service men to deliver and operate same under the direction and supervision of the well owner or drilling

168

contractor, or his representative, to do the following work: (the work to be done is then described) Well owner or drilling contractor will pay you as rental for the use of such cementing equipment and service men the sum of $225.00.

"As a part of the consideration hereof, it is agreed that Halliburton Oil Well Cementing Company shall not be liable or responsible for any loss, damage, or injury to said well resulting from the use of such cementing equipment, or from the acts of any person engaged in doing such work on the above described well.

"It is expressly understood and agreed that Halliburton Oil Well Cementing Company will not be bound by any agreement not herein contained."

■■ No executed work order was ever produced in evidence but there was no issue made that there was none executed, and we think the record justifies the assumption that one was executed and for the sum of $225, the usual fee charged. We do not, under the general rules of law applicable to a case of this character, regard the work order above quoted as free from ambiguity. Every contractor is from necessity subject to some sort of general direction, supervision or control by the owner. Otherwise the undertaking and investment would be subject to considerable hazards. To take one out of the class of independent contractor it is essential that the direction, supervision or control go further than to the ends sought, and must extend to the details of the work. This work order does not make plain that character of direction, supervision and control. It is necessary to look to all the facts and circumstances surrounding the transaction.

■ The Shannon case, supra [257 S.W. 524], adopts the following as an accurate and expressive definition of a contractor: "A contractor is any person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details. The true test of a contractor would seem to be that he renders service in the course of an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished."

Halliburton, we think from all the facts and circumstances in this case, engaged in an independent business. The business of squeezing a well is a highly technical business. It requires special machinery and equipment, patented appliances, and specially skilled and trained men. A squeeze job is not a regular routine part of the ordinary drilling operation. It is many times required, and when required a specialist is called in with his special equipment. Halliburton was all this. Its men and equipment went out as usual to the Bentex well, Harmon No. 4, and performed a specific piece of work. It supplied the technical equipment and men. It paid the men their salaries or wages and collected from Bentex a regular fee of $225, which this record discloses to be the usual and customary fee or sum for such a piece of work, a gross sum of money.

The next inquiry is: Did Halliburton surrender to Bentex direction and supervision as to the details? McMillian was the field superintendent of Bentex and had the general direction and supervision of all its field production work. The facts are that neither Bentex nor the drilling company, Carmos, had the equipment and skilled workmen to do the squeeze job and it was necessary to call in some other. They called in Halliburton, or its equipment and men, as Halliburton says. McMillian nor none other on the drilling job knew anything about the technical operation of the Halliburton machinery. McMillian knew the results desired, the condition of the well as to depth, sizes of casing, perforations, etc., and in a very general way how to get the results desired. As McMillian said in the course of his testimony, he called in Halliburton to do the squeeze job just like he called on his attorneys to try his case for him, rather than call in a physician. He needed and required the services of an expert for a particular piece of work and called in one. McMillian could not direct and supervise in all its details an undertaking about which he had no knowledge.

■ The supreme test of the relation is the right to control, not as to the result but as to the details, and when this element is present the person employed is an employee or servant, and when absent he is a contractor, unless a different conclusion is impelled from all the other circumstances. Shannon case, supra. To our minds the facts and circumstances here make inescapable the conclusion that Halliburton was a contractor. To hold otherwise would

set up a rule that would enable parties by almost any sort of designation to create a relationship regardless of the facts which would from necessity work great injustices to others who were in no wise parties to the contract.

It is not what a thing may be said to be that constitutes it such. It is the characteristics of the thing. It is said here that it was the intention under the work order to create the relation of employer and employee as between Halliburton and Bentex rather than that of independent contractor, but the question is, was it done? We think all the facts and circumstances of the case justify the finding and conclusion that it was not. The rules of law applicable to the facts of this case may be found in the leading case of Shannon v. Western Indemnity Co., supra, and we deem it unnecessary to undertake to distinguish the many cases on this question or to further discuss this much discussed subject, except to suggest a reading of the Rittiman case, Texas & N. O. R. Co. v. Rittiman, Tex.Civ.App., 87 S.W.2d 745, for the distinction. This contention of Halliburton is overruled.

Halliburton takes the position that it all over invariably operates under its work orders with the express understanding and intention to rent to all those who desire its services its special machinery and equipment and employees for squeeze jobs. The attitude is little, if anything, short of saying to those who need and desire to avail themselves of that specialized service that we own the necessary equipment and men which we rent or hire out for such purposes, the men upon the same basis as the equipment. It takes us back to our own ante-bellum days, to say nothing of the conditions our forebears fled. To permit individuals or concerns to commercialize the services of men on such basis is repugnant to all our American ideas of individualism and contrary, we think, to public policy. To legalize, that is, to permit and encourage, such a practice must from necessity lead to a system of limited bondage. We are not prepared to say the work order is susceptible of the construction the renting extends to the employees. The evidence and facts of the case are contrary to and inconsistent with the theory the Halliburton men were the special employees of Bentex.

The next group, Group No. 2, challenges the action of the court in submitting Special Issue No. 2, wherein the jury were called upon to find if the Halliburton men kept a proper lookout, upon the ground that as a matter of law there existed no duty upon the part of anyone to keep a lookout for the safety of Herndon, or any other. This is laid on the contention the pressure was not unusual and excessive and that an explosion or accident had never before been known by those present to have occurred and the occurrence could not have been foreseen. All that is required is that injury might have been reasonably anticipated and foreseen as a result of the operation being performed. Missouri-Kansas-Texas R. Co. v. McLain et al., 133 Tex. 484, 126 S.W.2d 474, and cases there cited. The testimony in this case is that the foremen for both Carmos and Bentex recognized the danger and warned the men away, and as stated by one, "just anything might happen" when such pressure is applied; when pressure is applied to connections there are always lots of chances that something might give; it cannot be known what pressure will do; every connection is a potential break; there is always a potential danger; if a leak should occur it is likely to cut a man in two like a buzz saw if it hits him. There is much in the record to indicate the apprehension of danger on the part of the workmen around this squeeze job. As said by one of the witnesses, there is always danger present in every operation about an oil well. The physics of hydraulic pressure is known to most men these days and that under the circumstances of a squeeze job anything may happen. It is not a sufficient answer to say that it had not before happened. Under the law we regard the evidence amply sufficient to justify the findings of the jury. This, we think, sufficiently disposes of the questions raised under assignments one to fifteen, inclusive, of Group No. 2.

Under propositions 16 and 17 of Group No. 2 Halliburton takes the position and argues that Herndon is guilty of contributory negligence as a matter of law. In the argument it is conceded contributory negligence is a question of fact, unless and only where the facts are such that ordinary minds cannot differ as to the consequences. It is likewise conceded that one confronted with a sudden emergency without sufficient time to determine with certainty the best course to pursue is not held to the same accuracy of judgment as would be required had he time for deliber-

ation, and otherwise as the general rules are found in 45 C.J. pp. 710–712, § 92, and in Wichita Valley R. Co. v. Fite, Tex.Civ. App., 78 S.W.2d 714, at page 716. The argument is based upon the facts that Herndon observed the unusual vibration and quivering of the casing; that he remained under there after the discovery long enough to call twice upon the pump operator to cut it off, allowing a few seconds between the first and second, before he ran; when he did run, that he took a circuitous, less practicable and more hazardous route out. Of course, it is easy now to see how this terrible accident could have been avoided. A quicker and more direct way out is now easily seen. Herndon undoubtedly was aware of some obligation to protect the property of his employers, as well as himself. The evidence discloses efforts on his part to protect himself. As said in the Wichita Valley case, supra, where there is evidence showing some care, and the question is one of the sufficiency of the care; in other words, of the best judgment, a question of fact for the jury is presented. We are of the opinion the facts in this case raise an issue of fact for the jury, and are not such that ordinary minds can draw no conclusion therefrom other than that of negligence.

Under the first and second propositions in Group No. 3 Halliburton assigns as error the conduct of the trial Judge. Plaintiffs rested on the afternoon or evening of June 26, 1940. The conduct complained of occurred on the reconvening of the court on the morning of June 27th, and is reported in the statement of facts as follows:

"The Court: I want to make this announcement to all counsel, if all counsel is present. I will not hear any argument on any law questions either at this time or at the close of the main case. I have thought this over very carefully, and I have decided that this case has gone entirely too long now, and we are spending so much time on it. This case has been tried twice, and we have spent a good deal of the county's money on jurors, at thirty-six dollars a day, and I don't like to have jurors waiting around out in the hall, paying them thirty-six dollars a day, just to keep a jury hanging around while we argue law questions. Therefore I will take up all motions that would be motions for instructed verdicts, as motions non obstante veredicto, after the case has been submitted to the jury and they have passed on it. That is the purpose of the law, of course, to cut out delays such as this. This case will go to the jury at the conclusion of the testimony, and then if counsel care to, they can file their motions for judgment non obstante veredicto, and may file written briefs in support thereof. I am going to handle it that way, gentlemen, and do not care to hear any argument.

"Mr. Hubbard: Well, may we have the privilege of filing written briefs now?

"The Court: You can file them with the Court, and file any motions or briefs in support of motions or anything you care to, but I will not hold up the trial of this case and keep these jurors around here, and pay these jurors while we act on and go into these matters. I am going to take them all up afterwards.

"Mr. Hubbard: You mean you don't want oral argument, but we may submit written argument, may we not, Your Honor?

"The Court: If it will take time to submit and consider written argument, then I won't hear that even, because this case is going to the jury all of the way down the line, and then I will rule on it afterwards."

Following the above statement of the court there was a short discussion between the court and counsel, whereupon one counsel for defendants said: "I believe, for the sake of the record, Your Honor, that we will take a bill." This led to other exceptions, because, as asserted, made in the presence of the jury and inflammatory and prejudicial and upon the weight of the evidence. The record discloses the case had been once before tried before the same court over a period of two weeks. More discussion followed, none of which is complained of, after which the court admonished and instructed the jury as follows:

"The Court: Yes, and I will make this statement to the jury: 'Gentlemen of the Jury, you will not consider for any purpose whatsoever the announcement of the Court here on matters of the conduct of this case. The Court has a right to conduct the case any way he cares to, and it is not a matter for you to consider. It is not evidence, but is simply instructions to counsel that I am giving here, and I want it considered as such. The bill of exceptions taken is that it is a comment on the weight of the evidence, and I mean it in no manner to be a comment on the weight of the

evidence, and you gentlemen will be instructed in the charge how to consider the evidence."

There was no suggestion made that the jury should be retired by anyone. We think the statements of the court not subject to the objections leveled at them. There is nothing inflammatory in them. There is no reference made to the evidence. The action could carry no impression to the jury a jury would not get on the submission of a case to it. The court did nothing more than to advise the parties he was of the opinion there were issues to go to the jury. This is done every time a case is submitted to a jury.

 The remaining propositions, three to eight, inclusive, in this Group No. 3 go to the alleged misconduct of counsel for plaintiffs, wherein it is claimed improper demands were made on defendants' counsel to see their investigation file and the improper examination of defendants' counsel with respect to the whereabouts of two witnesses, being two of the Halliburton men who worked on the squeeze job. The record in this respect is too long to copy here and we shall attempt to state it briefly. Herndon, the plaintiff, was on the stand and was tendered the defendants for cross-examination. A representative of the defendants in Houston, but not any of the lawyers engaged in the trial, had seen a file of plaintiff's and a request for three statements was made for the purpose of the examination. They were tendered, but upon condition they would be introduced in evidence. This was declined by the defendants. An argument followed concerning an agreement previously made with respect to them, between Mr. Howell, for plaintiffs, and Mr. Hubbard for the defendants, whereupon Mr. Howell said:

"Mr. Howell: No sir. The only thing is, we require that they introduce them in evidence before the jury, and right here, if the Court please, we want to here now call on these attorneys to let us see the investigation file of the Bentex Oil Corporation and the Halliburton Oil Well Cementing Company. Ben Herndon will testify that he had a conversation with a representative of Halliburton.

"Mr. Brown: Now, if the Court please, it seems to me that this testimony has gone far enough, the testimony of these lawyers.

"The Court: That is not testimony, Mr. Brown.

"Mr. Brown: Halliburton objects to all of the testimony of Mr. Howell for the reason that it is prejudicial and inflammatory.

"The Court: Mr. Howell is not on the stand, Mr. Brown. That is a misnomer, when you say testimony. It is a statement to the Court.

"Mr. Brown: Then we object to that statement made in the presence of the jury, because it is prejudicial and inflammatory.

"The Court: I will instruct the jury not to consider it, and I think any further discussion about this perhaps should be out of their presence. Gentlemen of the jury, the discussion—

"Mr. Brown: We want our bill.

"The Court: —that has taken place here has been purely matters between the counsel and the court, and not matters that you should consider or take into consideration in your deliberations on the case. You will disregard the statements made by counsel, all counsel, as well as the court, in that connection.

"Mr. Howell: I would like to say, if the Court please, that I would not have made that statement and that request had it not been that the same statement and request had been made by Judge Hubbard previously."

The court denied the request on the ground the files were private and confidential. On the following day the record shows the following, to which exception was taken: "Mr. Howell: If the Court please, at this time we now have the original statement of Ben Herndon, dated September 16th, 1937; the original statement of Mr. H. D. Carpenter, dated July 26, 1937, and the report of the accident to the Industrial Accident Board. This is one of the original copies, signed by H. D. Carpenter, under date — well, filed July 29, 1937, and we now tender these to counsel. We would like to ask counsel to give us permission, in the presence of the jury, to have access to their files in the same way that we have given them access to our files, and if they refuse to do that, we ask them to do this, to let us have signed statements which these defendants have of George Brugh, M. A. Gallia, or Bert Gallia, and Mr. Randle, the operator of the Halliburton pumps, and Jack Kidd, or Jack Eastland, whatever his name is."

At the conclusion of the examination of Herndon, his attorney, Mr. Kirkham, asked that C. G. Randle, the Halliburton truck operator on the squeeze job be called. Much conversation as to whether or not he was present or would be followed. Mr. Brown, attorney for Halliburton demanded that Mr. Kirkham give the information upon which he stated he understood Randle was present. A considerable argument and wrangle ensued about whether or not the witness was present or would be, at the conclusion of which the court instructed the jury to disregard it all. No request was made to retire the jury, nor any objections made until the conclusion of the proceeding.

On the following day Mr. Brown, one of the attorneys for Halliburton, was called to the witness stand and inquiries made of him as to the whereabouts of the witnesses Randle and Peck, workmen of Halliburton on the squeeze job. Much controversy took place, but no objection that anything improper was transpiring in the presence of the jury was made, nor a request made for the retirement of the jury. Mr. Brown was followed by Mr. Saye, likewise counsel for Halliburton, and like inquiries made of him. It was developed the witnesses had been instructed to be at or near Sinton, in an adjoining county, where they could be called on a half day's notice. No objections were made to this procedure, except at the conclusion of which Mr. Hart for Halliburton moved to strike and withdraw from the consideration of both court and jury all the testimony of both Messrs. Brown and Saye. An exception was saved on the ground it was highly prejudicial and offered for the purpose of placing Halliburton in a false light before the court and jury with respect to these witnesses or persons. Mr. Kirkham took the position he was offering the testimony as a predicate to introduce the testimony given by the witnesses at the former trial of the case. The court ultimately instructed the jury not to consider any of the proceeding for any purpose as between the plaintiffs and all parties other than Halliburton, but permitted it to stand as to it.

We are not going to undertake to make any applications with respect to the matters here under consideration to the situations found in the authorities. After all, a matter of this nature has to stand on its own peculiar facts. We have carefully gone through the whole of the record covering the matters here complained of and have reached the conclusion nothing occurred that was calculated to prejudice the jury against any party to the suit, nor create a bias in favor of any. Furthermore, we regard the objections and exceptions as coming too late. Had the objections been made at the inception of the procedure the Court might have stopped it or otherwise conducted it. We do not want to be understood as approving the procedure here indulged in. We do not. These objections overlook the intelligence of the jury, we think. The jury usually consists of ordinary, average men of intelligence. The jury, on the whole, are as smart as anyone else around the trial. To assume they do not know what goes on is to discount their intelligence. They discriminate capably between common "horse-play" and genuine performance. He who engages in the former gains no advantage with the jury or others. To hold the jury verdict is influenced by considerations aside from the realities of the case is a reflection on the intelligence and integrity of the jury.

The first complaint under Group No. 4 goes to the court's definition of negligence. It is: "By the term 'negligence,' as used in this charge is meant the failure to exercise ordinary care. And ordinary care is that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances." This definition is universally recognized as correct. It is a stereotyped one. It is exactly the definition used and approved in Stedman Fruit Co. v. Smith, Tex.Civ.App., 28 S.W.2d 622, writ dismissed, with the exceptions the word "use" is employed where "Exercise" is used here, and "that" for "which." The definition found in City of Waco v. Diamond, Tex.Com.App., 65 S.W. 2d 272, 273, is just another definition. The court does not undertake to set it up as an exclusive one or to condemn other recognized and accepted definitions.

The second, third and fourth propositions under this group complain of the manner of the submission of the issue of unavoidable accident, rather than to the suggested form of the answers to be given by the jury. Those were: "It was not the result of an unavoidable accident," or "It was the result of an unavoidable accident."

It is contended this is error under the authority of Gulf C. & S. F. R. Co. v. Giun, 131 Tex. 548, 116 S.W.2d 693, 116 A.L.R.

795, which modified Southern Ice Co. v. Richardson, 128 Tex. 82, 95 S.W.2d 956, both opinions by Judge Taylor. Judge Taylor merely suggested another way which he regarded better than his former suggestion. He did not hold the former is error. There has been very recently some clarification and relaxation of the rules applicable to unavoidable accident. See Hicks v. Brown, Tex.Com.App., May 28, 1941, 151 S.W.2d 790, and Wheeler v. Glazer, Tex.Sup., June 11, 1941, 153 S.W. 2d 449, 452, neither reported [in State reports]. In the latter it is said:

"The only legitimate purpose to be served in submitting unavoidable accident is to call the matter to the attention of the jury, so that it will not be overlooked, and so that the jury will understand that they do not necessarily have to find that one or the other parties to the suit was to blame for the occurrence complained of. This purpose is fully accomplished when the jury is told that the occurrence in question was an unavoidable accident if it happened without the negligence of either of the parties to the suit."

It is heartening to find coming from the Chief Justice a suggestion there may be some suspicions as to the illegitimacy of this issue. It came and has remained somewhat in the role of a "sniper." It has resulted in much confusion and wrought great havoc on justice.

Under the fifth and sixth propositions complaint is made as to the form of Special Issue No. 2, because there is no pleading to support it and was not limited with respect to the time and circumstances pleaded. Special Issue No. 2 is: "Do you find from a preponderance of the evidence that the men accompanying the Halliburton Oil Well Cementing Company equipment and truck failed to keep a proper look out at the time and place in question?"

 The petition was a detailed narration of the alleged facts leading up to the squeeze job and the job itself. It undertook to describe how the job was done and Herndon's injury while the job was being done. It averred the employees of Halliburton "failed to keep a careful and proper look out for one in a position of danger such as this plaintiff, * * * and that said acts and omissions constituted negligence which was a proximate cause of plaintiff's injuries." This was followed by the specific allegation: "(a) In the failure of its said employees to keep a proper look-

out during said pressure test in respect to said casing and equipment." The whole trial was devoted to the proposition of who was responsible for injuries sustained while a particular squeeze job was being performed. What occasion in question could have been meant other than this particular squeeze job? How could the jury, or any reasonable person, have gotten any other notion or impression as to what occasion was inquired about? The law is interested in getting at practical, reasonable, just results arrived at in a common sense fashion. We interpret the issue to be within the pleading. The only requirement is that the issue be substantially within the pleading and not literally in the language of the pleading. Speer on Special Issues, § 179, pp. 236, 237; 41 Tex.Jur., § 271, p. 1098. If the issue were subject to technical objection, yet, as said in Traders & General Ins. Co. v. Jenkins, 135 Tex. 232, 141 S.W. 2d 312, at page 315, the case should not be reversed because the form may be objectionable, unless objectionable to the extent it denies a party a valuable right. Of course, the court there was considering a different question, but that renders the rule none the less applicable. See, also, Tex. Jur. Vol. 41, p. 1087, § 266, and cases cited; also §§ 267 to 270, inclusive.

 The complaints discussed in order under propositions seven and eight complain of the refusal of the court to give certain requested special issues. Halliburton in substance alleged that Herndon was negligent in going under the derrick floor without warning or notifying its operator he was going under; that he and all other employees were warned to stay away from the rig and platform while the squeeze operation was being done and that he negligently failed to heed such warning. It was admitted Herndon went under in response to the request or command of McMillian without warning or notifying Halliburton's men, and this was assumed by the trial court in submitting Special Issue No. 26, hereinafter copied.

The requested issue was: "Do you find from a preponderance of the evidence that plaintiff, Ben L. Herndon, went under the derrick floor, without warning or notifying the operators of the Halliburton equipment that he was going to do so?"

This issue was followed with issues of negligence and proximate cause.

The court submitted Special Issue No. 26, as follows: "Do you find from a pre-

ponderance of the evidence that the failure of Ben Herndon to warn the operator of the Halliburton equipment that he was about to go underneath the derrick was negligence on the part of Ben Herndon?"

On the assumption, we take it, that this issue, coupled with the admission and undisputed proof that he did go under without warning Halliburton's workmen, was a full and complete submission of the issues pleaded and requested in the issue quoted above and the one immediately following calling on the jury to find if it were negligence, the court refused the requested issues. We think it a proper submission and there was no error in the refusal. There was an affirmative answer to the first issue admitted and rendered unnecessary its submission. Special Issue No. 26, given by the court, submitted the other completely. To demonstrate it we quote it: "Do you find from a preponderance of the evidence that so going under said derrick floor without warning or notifying the operator of the Halliburton equipment that he was going to do so, if you have so found the fact to be, was negligence on the part of Ben L. Herndon?"

■ Likewise issues were requested and refused wherein the jury were called upon to find if Herndon was warned to stay away from the derrick and if he failed to heed the warning. These were followed with appropriate issues of negligence and proximate cause. The evidence was that McMillian warned all employees to stay away, and that probably Halliburton's man Peck did the same thing. Herndon's position was he did not hear any warning. Aside from that the jury found McMillian ordered him under. The court submitted this issue: "Do you find from a preponderance of the evidence that Ben Herndon was present and heard any warning given to him to stay away from said derrick when pressure was being placed upon the casing and equipment?"

The jury answered, "No."

This issue was followed with issues of negligence and proximate cause. Of course, it goes without saying if Herndon heard no warning that none was given him, and he could not be guilty of failure to heed a warning he had never had. The issue requested was: "Do you find from a preponderance of the evidence that plaintiff Ben L. Herndon was warned to stay away from the derrick when pressure was being placed upon the casing and equip-

ment?" The two issues call for a finding as to the same identical fact, was he warned? The difference in phraseology constitutes no difference. As hereinbefore said, if the issue is submitted in substantial compliance with the pleadings and facts it is sufficient.

■ Halliburton pleaded Herndon was negligent in being upon or in contact with said equipment and connections under the derrick floor at the time of the accident, and requested the following issue, followed with appropriate issues of negligence and proximate cause: "Do you find from a preponderance of the evidence that plaintiff, Ben L. Herndon, was upon or in contact with the drilling connections under the derrick floor immediately prior to the separation of the casing?" The court submitted a special issue, No. 38, as follows: "Do you find from a preponderance of the evidence that plaintiff, Ben L. Herndon, climbed upon the drilling connections under the derrick floor immediately prior to the accident?" We are unable to see any difference between the issue requested and the one given by the court. What has already been said applies to this proposition. There is as much variance between the exact wording of the pleading and the requested issue as between the pleading and the one given.

■ The last complaint of Halliburton is that the court erred in failing to give to the jury the following special issue: "Do you find from a preponderance of the evidence that in going under the derrick at the time and upon the occasion in question and in the light of all the attendant circumstances the plaintiff, Ben L. Herndon, assumed the risk of the casing becoming disconnected?" This requested issue was followed with a proposed definition of assumed risk. Halliburton had pleaded such assumed risk.

In Texas the doctrine of assumed risk applies only to the relationship of master and servant, employer and employee. Ford Motor Co. v. Maddin, 124 Tex. 131, 76 S. W.2d 474, page 476, paragraph 4. This case is a complete answer to the contention. Other cases are City of Weatherford Water, Light & Power Co. v. Veit, Tex.Civ. App., 196 S.W. 986, 990; San Angelo Water, Light & Power Co. v. Baugh, Tex. Civ.App., 270 S.W. 1101; El Paso Printing Co. v. Glick, Tex.Civ.App., 246 S.W. 1076; Texas Pacific Coal & Oil Co. v. Grabner, Tex.Civ.App., 10 S.W.2d 441; Nesmith v.

Magnolia Pet. Co., Tex.Civ.App., 82 S.W. 2d 721; Snelling v. Harper et al., Tex.Civ. App., 137 S.W.2d 222, 226.

We find no reversible error and the judgment against Halliburton will be affirmed.

 On the appeal perfected by the plaintiffs against Bentex and McMillian, as said in our statement of the case, the sole question to be determined is: Is Carmos, under the record here, constituted an independent contractor as a matter of law? We take it there is no disagreement about the fact the contract depth had been reached and the well completed under the terms of the contract prior to the date the squeeze job was undertaken. We understand also that it is conceded by all parties Carmos was, with respect to Bentex, an independent contractor until the contract depth was reached. We regard it as established without dispute that the deepening of the hole beyond the contract depth of 6,500 feet, including the squeeze job, was done under the original written contract and the relationship of independent contractorship continued, unless a new contract was entered into. In support of the last statement we quote from the written contract: "Contractor is * * * to carry well to completion with a hole of sufficient size in which five and one half inch (5½") O. D. casing may be set and after Contractor sets five and one half inch (5½") O. D. casing and drills in well on sand or at some depth selected by the Company before well is drilled to contract depth (which is 6500 feet), it is understood that this contract is completed as far as the contractor is concerned, and if the well should fail to produce and Company desires it to be drilled deeper, it would call for a new contract at a price per foot to be agreed upon between Company and Contractor or Contractor should do the work on day time at same rates of pay as mentioned in this contract." The contract fixes the day time rate at $200 per twenty-four hour day.

The question is: Was there a new contract entered into? If so, what are the terms of it? Bentex and McMillian say there was. The plaintiffs say there was not. There is testimony in the record that the parties never did get together on just what was to be paid and on any details, but it was assumed the work was on day pay as provided in the contract. There is other testimony the parties got together and made some adjustment of the pay in the light of

all the trouble had. There were no questions submitted to the jury such as are above propounded. The jury were called upon to say if Carmos was an independent contractor at the time of the accident and they answered it was not. McMillian and Bentex in their brief, in support of the finding of the jury and the judgment of the court in their favor, divide it into two main headings, briefly stated: (A) Evidence of the new contract, and (B) the right to control the deepening operations in its details. To establish the new contract McMillian and Bentex refer to the testimony of Mr. Benedum, President of Bentex, at page 11 of the statement of facts. The reference is undoubtedly to this answer of his:

"I paid $2.00 per foot to 5800 foot sand, and when we got to that it was salt water and we drilled on down to 6500 feet, at $2.50 per foot and went back in on day time of $200.00 per day for rental of the rig, and the people who worked for Carmos and took over Carmos's whole equipment at the rate of $200.00 per day."

Immediately following this answer he was called on for what was said by the parties. He was unable to give any conversation, and gave the explanation: "I may have talked to them through McMillian, who was the Superintendent." And again: "I think I went through McMillian on it." Following right on he testified: "Q. Isn't it a fact, that at the last trial of this case I asked you this question, if it wasn't a fact, that outside of the change of pay from the basis of pay, from so much per foot to just so much per day, if I didn't ask you if there was any other change in that arrangement, and isn't it a fact that you said, 'No, sir, that was the only change in that arrangement.' Is that a fact?" "A. In substance, it is true."

The next reference is made to pages 187 and 188, Mr. Carpenter testifying, and the question and answer are as follows:

"Q. No, sir, I asked 'what were the terms of your employment after you tore down the rig in the first instance and rigged it up again and started on your daily salary.' A. According to our drilling reports, we reached the depth of 6370 and waited on the orders and the drilling report and the notations is on this drilling report 'and day work;' that means day work at $200.00 per day, starting at that time while we were waiting on the orders and when we got our orders Mr. McMillian agreed that they would assume responsibility for the string of

drill stem we used in case anything happened that we had a drill stem stuck, that they would assume all responsibility and they agreed to assume all responsibility in addition to the regular rental of $200.00 per day."

The other reference is to page 252, but the particular answer is not pointed out and we are unable to tell what the reference is made to. We find nothing that relates to a contract. These references are made to the testimony of Mr. Benedum and Mr. Carpenter, Secretary and Treasurer, and General Manager for Carmos. These gentlemen and Mr. McMillian, the Field Superintendent for Bentex, are the only parties who could have agreed on anything. The whole of the testimony of the three covers 350 pages of the statement of facts. We assume this is the only testimony indicative of the new contract these defendants could find. The record discloses when the contract depth was reached Carmos started to dismantle its rig; Bentex advised Carmos they desired to go on down to 6,900 feet. Carmos had had some trouble in that it stuck two strings of pipe. Carpenter, therefore, required Bentex to assume responsibility for the drill stem, in case anything happened, and as he put it further, "they agreed to assume all responsibility in addition to the regular rental of $200.00 per day." Carmos put what was necessary on the rig and the same was to be returned in the same order less wear and tear. The whole record discloses this situation: The original contract was completed by reaching the full contract depth of 6,500 feet. Bentex desired the hole drilled to 6,900 feet. Carmos was unwilling to proceed to such a great depth under the circumstances unless Bentex would assume responsibility for the loss of pipe, drill stems and damage done to the rig. Bentex assumed that responsibility, and the work started and was carried to a depth of 6,900 or 6,950 feet when the squeeze job was undertaken. This, without any agreement or understanding as to what the pay should be or other conditions of the operation, but on the assumption of day pay. We regard this as a mere modification of the terms of the original contract to the extent the responsibility for the things enumerated above would be with Bentex, whereas it had theretofore been with Carmos. The details of the operation remained the same. We think the rules found in the Shannon case, supra, and the rules heretofore applied in this case to the situation as between plaintiffs and Halliburton when applied here, under all the facts and circumstances of the case, lead to and make plain the conclusion the situation of the parties with respect to details were never changed. We think there is no evidence of a new contract which is essential to sustain the verdict of the jury, but a mere modification of the old with respect to the responsibility for loss and damage as heretofore pointed out, and the finding of the jury, therefore, without support in the evidence.

In the course of the drilling operations prior to reaching the contract depth Carmos from time to time performed other operations as provided in the contract on day time, such as coring, reaming, swabbing, etc. We take it no contention could or would be made that at such times Carmos ceased to be an independent contractor. We can see no difference in the situation of the parties on those occasions and when the hole was being deepened and the squeeze job done, except as to the responsibility for damage and loss, as heretofore pointed out.

It follows, therefore, that the judgment in favor of McMillian and Bentex must be reversed and here rendered in favor of the plaintiffs, and that the plaintiffs recover jointly and severally against all the defendants their damages as found by the jury.

■ McMillian and Bentex have brought into their brief certain assignments of error, but have briefed none of them. We have not, therefore, undertaken to pass on them.