**T. G. & M. DRILLING COMPANY,**
Appellant,

v.

**Jessie Denman KERSH, Appellee.**

No. 6061.

Court of Civil Appeals of Texas.

Beaumont.

Nov. 8, 1956.

Keith, Mehaffy & McNicholas, Beaumont, for appellant.

Raymond T. R. Tatum, Beaumont, for appellee.

R. L. MURRAY, Chief Justice.

This is a plea of privilege case. Appellee Kersh sued appellant T. G. & M. Drilling Company for damages for personal injuries received while working as a member of a crew on a drilling rig in Hardin County. Suit was brought in Hardin County. Appellant filed its plea of privilege to be sued in Wichita County, which plea was duly controverted. Appellee sought to maintain venue in Hardin County under Subdivision 9a of Article 1995, Vernon's Ann.Civil Statutes of Texas. After a hearing, the trial court overruled the plea of privilege and appellant has duly perfected its appeal.

The statement of facts is not lengthy. Kersh, the appellee, was employed not by appellant, but by Oil Field Casing Crews. He and the crew he was working with were engaged in setting casing on a drilling job at Saratoga, in Hardin County. Another crew, the regular drilling crew, was also working on the floor of the drilling rig. Appellee alleges this crew was that of appellant. Appellant put on no evidence in that regard, but on appeal contends that there is no evidence to show that such was the case. Kersh was handling a piece of pipe, spun by a rope pulled by a machine called a "cathead". The regular cathead operator, a fellow member, left to get a drink of water, and some person, not a member of Kersh's crew of fellow employees, did something wrong about pulling the rope on the cathead and pipe, Kersh's hand was caught by the rope and two fingers of his hand were cut off. Kersh and one Beard, a fellow member with Kersh of the Oil Field Casing Crews' crew on the job at that time, both testified that the operator of the cathead who improperly operated the cathead and caused the injury, was not a member of their crew, and that the only persons on the floor of rig at that time, besides their crew, were the crew of the regular drilling crew. There was a sign on the drilling rig reading: "T. G. & M. Drilling Company." The payment to Oil Field Casing Crew for the work done at the drilling site was made by a check from T. G. & M. Drilling Company.

Appellant contends that there was no proof that the person who committed the alleged negligent act was an employee of the appellant T. G. & M. Drilling Company. It further contends that there was no proof that the person committing the alleged negligent act, even if it be assumed that he was an employee of appellant, T. G. & M. Drilling Company, was acting in the course of his employment at the time of the commission of the act complained of.

■ We believe that the evidence was sufficient to support the trial court's implied finding that the person who committed the alleged negligent act in the operation of the cathead was an employee of the appellant. The presence of the sign on the drilling rig bearing the name of the appellant company and the fact that the appellant company paid the appellee's employer for the casing work being done at the time the appellee was injured, and the further fact that by a process of elimination, from the testimony of Beard and Kersh, the person who mishandled the operation of the cathead was a member of the appellant's drilling crew at the site, all of these circumstances justified the court in finding that one of the appellant's drilling crew employees was the person who committed the act. Without a lengthy discussion, we overrule the appellant's first point.

The questions raised under the appellant's second point, however, will be discussed in more detail. The appellant and the appellee are in full agreement that the law requires the plaintiff in a hearing upon such a plea of privilege to prove by evidence satisfactory to the trier of the facts not only the negligent act complained of and that such act was a proximate cause of the plaintiff's injuries, but also, under Subdivision 9a of Article 1995, Vernon's Annotated Civil Statutes (the Venue Statute), that such negligent act or omission was that of

the defendant or that of defendant's servant, agent or representative, acting within the scope of his employment. The principal question for determination here is whether the proof meets the requirement of showing that the person who committed the act, a member of appellant's drilling crew, was acting within the scope of his employment as such when he operated the cathead. The proof on that phase of the case is almost entirely lacking. The man who operated the cathead was never identified by name. The evidence, as we noted above, only went so far as to show that he was not a fellow worker with the appellee Kersh in the casing work crew and to show that the only persons on the floor of the rig at the time were the members of the casing crew and some members of the drilling crew, employees of the appellant. The witness Beard, on cross examination, gave the following testimony:

"Q. You say you all had 6 members of your casing crew that day? A. Yes, sir.

"Q. Is that a standard sized crew? A. Well 5 is the regular crew but they ordered 6 men.

"Q. Sometimes when you go out with 5, you pick up a man from the drilling crew that's on the location and get him to operate one of those catheads, don't you? A. No sir.

"Q. Have you ever done that? A. I've seen it done, yes, sir.

"Q. Haven't you done it yourself? A. No, sir.

"Q. Now, on this particular day, Mr. Beard, had you not had Joe Heabert on one of those catheads? A. Yes, sir.

"Q. And didn't you have a man that was a part of the drilling crew on another of the catheads? A. Yes, sir. I didn't have him on there; it's his business over there—I mean that's his job over on the other cathead.

"Q. Now you all were doing the casing work at the time, were you not? A. Yes, sir.

"Q. When that casing work is going on, that is work which the casing crew exclusively does, is it not? A. Yes, sir.

"Q. And if you were borrowing a man from the drilling crew or one is loaned to you, then he takes his orders from you, does he not? A. No, sir.

"Q. Who does he take them from? A. The driller. * * *

"Q. Was there any person close enough to operate the cathead other than the one that you referred to? A. No, sir.

"Q. Did Oil Field Casing Crew borrow an employee to operate the cathead that day? A. No. sir."

Kersh, the appellee, testified in part a follows in describing what the unidentifie person did.

"Q. What was his job out there; what did that man— A. This particular person, I couldn't say what his particular job was at the time, but he didn't work with us.

"Q. Where had he been working immediately prior to that; what had he been doing? A. Well he belonged out on the pipe rack.

"Q. He had been working out on the pipe rack before? A. That's where the crew generally goes except two men, the driller and the derrick man; the derrick man generally pulls the pipe in the V-door on the off cathead.

"Q. All right. Now when—who was operating, the regular cathead operator that day? A. I had been. Mr. Beard and I, we divided ip up. It was a pretty hot day and a third party, Joe Heabert, he relieved me and in between

joints while I was getting my rope ready he went to get a drink of water.

"Q. Who was that, Joe Heabert? A. Yes, sir.

"Q. All right. A. And before he got back this other person picked the rope up and balled the cathead up, took several wraps, he didn't take the proper slack out of the line; it caused the cathead to ball up and pull my fingers into it and cut them off.

"Q. Well, did this person that stepped up there and started off, reach the cathead, did he give you any signal that he was going to try to spin a joint in there? A. No, sir. * * *

"Q. At that time, state whether or not you knew that the regular cathead operator was off getting a drink of water? A. Yes, sir, I was standing there waiting on him; I was looking at him.

"Q. All right. Now, what is customary on a site like that, is it customary to have a casing crew there at this particular time? A. Some people use a casing crew and some double their own.

"Q. Well, if a casing crew is being used, you have a casing crew there, do you not? A. Yes, sir.

"Q. What other crew would you have there at that particular time when your're doing the thing that was being done at the time you were injured? A. No other crew on the floor around the works.

"Q. And what other crew would you have there on the drilling site? A. The drilling crew themselves. * * *

"Q. Mr. Kersh, the job of the casing crew as I understand it was to put the pipe in the hole? A. Yes, sir.

"Q. And while that was going on as you've testified, the only people on that floor were members of the casing crew? A. And 2 members of the drilling crew; the driller himself, to operate the rig and the drilling crew's derrick man which operates as a rule the off cathead to pull the pipe, the next joint of pipe in the V-door.

"Q. Now when the drilling crew, this derrick man is operating that off cathead, he takes his signals from a member of the casing crew, does he not? A. Yes, sir.

"Q. And whenever you go out short handed, as you do sometimes, and you have to get some member of the drilling crew to operate the cathead that you say pulled your finger into the pipe— A. Well we never use a—

"Q. You never use those? A. We put him some place, generally in the V-door because we don't trust him.

"Q. But if you did, he would in turn be subject to the direction of the members of the casing crew, the pusher of the casing crew, wouldn't he? A. Yes, sir, that extra man that we use.

"Q. And that would be true if you got any member of the drilling crew to do work with the casing crew; he would be subject to the pusher of the casing crew, wouldn't he? A. Yes, sir.

"Q. And he'd take his orders from him? A. Customarily; some of them get onery sometime and we have to call on his boss to make him fall in.

"Q. But ordinarily he takes it from the pusher of the casing crew? A. Yes, sir.

"Q. And to that extent when he's under the control and supervision of the pusher of the casing crew in doing the work associated with casing the well, isn't he? A. He should be."

It is evident from examination of this testimony that there is no clear showing that the unidentified man who mishandled the cathead was acting in the course of his duties as a member of the drilling crew, employed by the appellant, when he was performing this operation temporarily. According to Mr. Beard's testimony, if the casing crew sometimes borrowed a man from the drilling crew, such a man would still take his orders from the driller, the boss of the drilling crew. On the other hand, according to Kersh's testimony the unidentified cathead operator had been working out on the pipe rack before he came on the floor of the drilling rig; the job of Kersh's casing crew was to put the pipe in the hole and the only people on the floor while that was going on were members of the casing crew and two members of the drilling crew, the driller himself to operate the rig and the drilling crew's derrick man. According to Kersh, too, whenever the casing crew had to get some member of the drilling crew to operate the cathead for them, such a borrowed or extra man would be subject to the direction of the pusher of the casing crew. He also testified that this would be true if they got any member of the drilling crew to do work for the casing crew, he would take his orders from the pusher of the casing crew. If it be true that the unidentified cathead operator was borrowed from the drilling crew to do that particular act or job and while he did so he was under the direction and control of the pusher or boss of the casing crew, then he became a borrowed employee and was no longer acting in the course of his employment for his regular employer. If on the other hand he was still subject to the direction and control of the driller or boss of the drilling crew, then he would have been acting in the course of his employment for the appellant. There is no evidence here as to how or under what circumstances or upon whose direction the unidentified cathead operator began his operation of that machine. We cannot learn from the evidence how he came to be operating the cathead at that time, who sent him there, or who was directing him, if anyone was. As to this particular phase of the case, we have concluded that the evidence is not sufficient to show that the cathead operator was acting in the course' of his regular employment as a member of appellant's drilling crew and the appellant's second point is sustained. It is apparent, also, that the facts have not been fully developed as to how this accident came about, and we do not feel that judgment should be rendered here, but rather that the judgment of the trial court should be reversed and the case remanded for a new trial.

The appellant's original brief in this case contained only two points of error, asserting that there was no evidence that the operator of the cathead was an employee of the appellant and that there was no evidence that such an employee, if he was, was acting in the course of his employment at the time. Appellant later filed, with the permission of the court, a supplemental brief containing points 3 and 4, by which it maintains that the evidence was insufficient in both respects as maintained in points 1 and 2 in the original brief.

We overrule the appellant's third point and sustain appellant's fourth point.

Because, as indicated above, the facts have not been fully developed in regard to whether the cathead operator was acting in the course of his regular employment, the case is remanded for a new trial.

Reversed and remanded.