In the Matter of the Complaint of DEAR-
BORN MARINE SERVICE, INC., et al.,
for Exoneration from or Limitation of
Liability of the OIL SCREW CARRY-
BACK.

Webster Barnwell ARMSTRONG, III, In-
dividually, Etc., et al., Plaintiffs-
Appellees,

v.

CHAMBERS & KENNEDY et al., Defend-
ants-Appellees-Appellants,

Esther M. LOVE, Intervenor-
Appellant-Appellee.

No. 72-2704.

United States Court of Appeals,
Fifth Circuit.

Aug. 22, 1974.

Robert H. Roch, Houston, Tex., for Esther Marie Love.

T. G. Schirmeyer, L. Glen Kratochvil, Houston, Tex., for Dearborn, Thoroughbred, et al.

Edward W. Watson, Houston, Tex., for Chapman Contracting.

Alice Giessel, Henry Giessel, Houston, Tex., for Drilling Eng.

W. Eugene Davis, New Iberia, La., Donald L. King, New Orleans, La., for Chambers & Kennedy, et al.

John N. Barnhart, Houston, Tex., for Lucille Monk et al.

Warner F. Brock, Houston, Tex., for Armstrong.

Carl Waldman, Ned Johnson, Beaumont, Tex., for Gaspard, Breaux et al.

William D. Hunter, Morgan City, La., for Cassel.

George B. Matthews, New Orleans, La., for Hartford.

H. Lee Leonard, Lafayette, La., for Employers Reins. Corp.

Wm. P. Rutledge, Lafayette, La., O. H. Deshotels, Jr., Kaplan, La., for Melancon et al.

Emile A. Carmouche, Crowley, La., Blake Tartt, Houston Tex., Edward W. Watson, Galveston, Tex., for Chapman and Home Indem. Co.

Before AINSWORTH, GODBOLD and INGRAHAM, Circuit Judges.

GODBOLD, Circuit Judge:

This consolidated litigation arises out of an offshore oil platform explosion that occurred May 28, 1970, over the outer Continental Shelf and caused extensive property damage and loss of human life on the platform and on a nearby vessel. The normal complexities engendered by such a holocaust are multiplied by the part-platform, part-admiralty factual context which necessitates meshing together the law of admiralty and the state law made the surrogate law of the platform by Rodrigue v. Aetna Cas. & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

The site of the explosion was an unmanned oil collection and storage platform located in the Gulf of Mexico twelve miles off the cost of Galveston, Texas and permanently affixed to the subsoil of the outer Continental Shelf. It was owned by Chambers and Kennedy (C & K), was maintained and operated by Drilling Engineering, Inc. (DEI) on behalf of C & K under a well-servicing contract, and it consisted primarily of five oil storage tanks with a capacity of 1,000 barrels each and one smaller tank. In March 1970, an agent of the Geological Survey [1] wrote to C & K requesting

---

1. The Secretary of the Interior has charged the Director of the Geological Survey with administering certain regulations relating to conservation of natural resources on the outer Continental Shelf. The pertinent regulations are at 30 C.F.R. §§ 250.1–250.100.

that it bring its platform into compliance with various safety and pollution regulations.[2] At this time the platform was in a generally deteriorated condition, some of the lateral braces were severely rusted, many of the boards were rotten or oil soaked, it was in need of painting, and in places the floor of the platform was warped. On April 10 C & K shut down production from the satellite wells whose production had been pumped into the tanks for storage, and the next day a barge transported to shore all oil then in the tanks.

Pursuant to its well-servicing contract with C & K, DEI began making the required alterations and repairs. DEI furnished a supervisor for the job and contracted with a labor supply firm to furnish pipefitters, welders, painters, and roustabouts. The work consisted of painting, sandblasting, and some "hot work," such as cutting with acetylene torches and welding. The hot work was generally done at an elevated heliport or at the perimeter of the platform away from the tanks. Since the platform was unmanned it was necessary that there be daily transportation from shore to platform and back to shore for those engaged in and supervising the work. Also, of course, various materials, supplies and equipment had to be transported to and from shore. Commencing May 3 or 4 and pursuant to an oral arrangement between DEI and Dearborn, the nature and consequences of which we will discuss later, the vessel serving these purposes was the CARRYBACK, an all steel, eighty-five foot vessel of 136 gross tons, powered by 670 h. p. twin diesels, having fifteen seats for passengers, and owned by Dearborn.[3]

Each day for the period after it arrived from shore and until it returned to shore the CARRYBACK remained in the vicinity of the platform, acting as a service and standby vessel. She carried a galley, cook and food and served meals to platform workmen as desired. She had toilets aboard—there were none on the platform—and workers could. come aboard her to use them. The DEI supervisor, Monk, came aboard her to do office work where he could be away from the wind and noise of the platform and in air-conditioned surroundings. He was permitted to use her ship to shore radio with the permission of the captain. By May 25, labor for the alteration and repair work was being supplied by Chapman Contracting Service (Chapman).

Between April 10, when C & K had shut down production from the satellite wells, and May 25, and for reasons not disclosed in the record, the tanks collected about 1,100 barrels of oil. DEI's jobsite supervisors, Rick Chapman of Chapman Contracting, and other executives of C & K and DEI knew that the tanks contained oil.

On May 27 representatives of the Geological Survey advised Monk, DEI's supervisor at the platform, that to comply with antipollution guidelines he would have to remove a valve from one of the equalizing lines between tanks. This was the first job to require breaking a connection leading directly to the oil storage tanks. Monk discussed the procedure with Overly, Chapman's supervisor at the platform, and on the morning of May 28 he discussed it with Rick Chapman, who had flown to the platform by helicopter to survey the work.

2. One regulation mentioned was 30 C.F.R. § 250.46, which provides:

"The lessee shall perform all operations in a safe and workmanlike manner and shall maintain equipment for the protection of the lease and its improvements, for the health and safety of all persons, and for the preservation and conservation of the property and the environment. The lessee shall take all necessary precautions to prevent and shall immediately remove any hazardous oil and gas accumulations or other health, safety or fire hazards."

3. Initially, for a few days, the vessel serving these purposes under the DEI–Dearborn oral arrangement was Dearborn's M/V PICTEN, a somewhat smaller boat. The CARRYBACK was substituted because a larger and more maneuverable boat was needed.

The District Court[4] reconstructed the attempts of May 28 to remove the valve:

. . . Mr. Overly instructed Mr. Scanlan, a pusher for Chapman, to remove the valve from the equalizer line. Mr. Scanlan, along with the two other Chapman employees, began working on the equalizer line and broke the union and cut the pipe with a pipe cutter. They took out the valve leaving a part of the equalizer line protruding in place. They then proceeded to take the valve and the other part of the equalizer line to the south end of the platform beneath the heliport and there fabricated, or threaded, a new piece of pipe called a nipple to put back in the equalizer line and reconnect it. Mr. Scanlan then went back to the equalizer line and screwed the new nipple in place. This procedure left two pieces of pipe to be connected together. Mr. Scanlan talked to Mr. Monk and told Mr. Monk that he was going to connect these two pieces by welding them. The facts do not reflect where this conversation took place—whether on the platform or on the *Carryback*. The facts do not indicate whether of not Mr. Monk told Mr. Scanlan to weld the line *in place* [or on the edge of the platform away from the tanks], or whether Mr. Scanlan told Mr. Monk he was going to weld the line in place. But the facts do reflect that at some time before the explosion Mr. Scanlan told Mr. Monk he was going to weld the line.

. . . . . .

Mr. Scanlan told Mr. Gaspard, a Chapman welder, and Mr. Breaux, a welder's helper, to weld together the two pieces of pipe that now constituted the equalizer line. . . . Mr. Gaspard began the welding and at the time that he struck an arc, there was an explosion. Burning oil then rapidly spread fire across the platform, resulting in [death and] injuries and damage there.

340 F.Supp. at 1231–1232 (emphasis in original).

The CARRYBACK was just downwind of the explosion, tied to the platform on a seventy-five foot line with her stern toward the platform. With the explosion a flaming ball of oil rose above the platform and was carried by a wind of about eight knots to a point directly over the CARRYBACK, where it descended "as if it were an exploding bomb" and "instantaneously wrapped [her] in consuming fire". In only minutes all aboard perished—Captain Armstrong, the master; crew members Love and Cassel; and Monk, DEI's supervisor. The vessel was reduced to scrap metal. Of approximately twenty workers on the platform five were killed.

Dearborn filed a petition for limitation of or exoneration from liability in the United States District Court for the Southern District of Texas, Galveston Division, and answers and claims in this proceeding were filed by DEI, C & K, the heirs of Monk, Cassel, Love, and Armstrong, and by several platform workers and heirs of platform workers. In Texas state court Monk's estate sued C & K and Freeport Operators (Dearborn's subsidiary) who removed the cause to the federal District Court in Galveston. Suits in the same District Court, Houston Division, were filed by C & K against DEI and Chapman for damages to its platform, and by the heirs of Armstrong against C & K, DEI, Chapman, and Freeport Operators. The limitation proceedings in the Galveston Division were subsequently consolidated with the Houston suits for trial in the Houston Division, and it is from judgment entered in these consolidated proceedings after a trial without a jury that this appeal is taken. The posture of the parties under the judgment (excluding awards of indemnity) can be summarized this way, insofar as pertinent to this appeal.

---

4. Its opinion is reported as Armstrong v. Chambers & Kennedy, 340 F.Supp. 1220 (S.D.Tex. 1972).

*"Platform Defendants"*

C & K: Owner of the platform. Violated safety regulations.

DEI: Operator of the platform. Violated safety regulations.

Chapman: Labor supplier. Negligent.

*Other Defendant*

Dearborn: Owner of the CARRYBACK. Negligence and unseaworthiness.

*Claims* [5]

Love and Cassel: Crew members killed aboard the CARRYBACK.

Captain Armstrong: Master, killed aboard the CARRYBACK.

Monk: DEI supervisor, killed aboard the CARRYBACK.

Property damage: Loss of CARRYBACK.

*Liability*

C. & K, Chapman, DEI and Dearborn:

Liable for deaths of Love and Cassel (no contributory fault by Love or Cassel). Liable for death of Captain Armstrong (25% contributory fault).

C & K, DEI and Chapman:

Liable for loss of CARRYBACK (25% contributory fault by vessel).

C & K, Chapman and Dearborn:

Liable for death of Monk (25% contributory fault).[6]

The District Court held C & K had breached a nondelegable duty imposed by regulations promulgated under the Outer Continental Shelf Lands Act 43 U.S.C. § 1331 et seq., to maintain a safe offshore platform.[7] DEI was found negligent in its supervision of platform operations. DEI employees specifically mentioned were Monk, the platform supervisor at the time of explosion, and Chenier, Monk's superior, neither of whom "adequately warn[ed] Chapman and its employees of the dangers incident to removal of the equalizer line."[8] Chapman was held negligent because of Rick Chapman's failure to warn his employees of the presence of oil in the tanks and for inadequate supervision of the welding by Scanlan, Chapman's pusher.[9] The District Court found that these breaches of

---

5. Claims of persons injured or killed on the platform, or in the sea after jumping from the platform, have been either settled or reduced to judgment and satisfied and are not before us. Nor is the matter of damage to the platform before us.

6. Monk's heirs did not sue his employer DEI.

7. The District Court cited 30 C.F.R. §§ 250.-45 and 250.46. Section 250.46 is set out in note 2 *supra*. Section 250.45 provides:

"In the conduct of all its operations, the lessee shall take all steps necessary to prevent accidents and fires, and the lessee shall immediately notify the supervisor of all serious accidents and all fires on the lease, and shall submit in writing a full report thereon within 10 days. The lessee shall notify the supervisor within 24 hours of any other unusual condition, problem, or malfunction."

The District Court further reasoned: "Even if this nondelegable duty were not set by statute, the court would have to impose it. . . . [T]he duty placed here upon the oil lease is similar to the traditional tort duty of one using an ultrahazardous substance." 340 F.Supp. at 1234.

8. The District Court listed four specific acts of negligence by DEI:

"(1) [failure] to suspend all burning and welding operations while the equalizer line was open as a result of the removal of a section of the line;

"(2) [failure] to seal this opening until that section of the line had been replaced;

"(3) [failure] to carefully supervise the removal and reinstallation of the line to see that no welding or other work that could possibly produce an ignition would be undertaken in the performance of this operation; and

"(4) [failure] to post warning signs on the tanks with instructions that no welding or hot work be done in this area."

340 F.Supp. at 1236.

9. The workers could have easily verified the presence of oil by visual inspection through a hatch at the top of each tank or by use of a device called a "sniffer." Testimony indicated that hot work on the platform should have been postponed until the oil was removed from the tanks and their interiors scrubbed with salt water.

duty by Chapman, C & K, and DEI combined with the faults of Dearborn to proximately cause the deaths, injuries, and property damage in issue.

Dearborn was found to have breached its legal responsibilities in several respects. The District Court found that CARRYBACK's master was negligent in mooring her in an unreasonably hazardous location. It found the vessel unseaworthy for being moored as she was, for failure to comply with 46 U.S.C. § 404, which imposes certain manning and inspection requirements on vessels "carrying passengers for hire," and for being manned by an incompetent crew. These acts of negligence and conditions of unseaworthiness, the District Court found, combined with the acts of the platform defendants to proximately cause the deaths of those aboard the CARRYBACK and the loss of the vessel itself.

Chapman contests the District Court's rulings on its negligence. Dearborn contests the rulings on its negligence and unseaworthiness. C & K and DEI do not contest findings of fault on their part but contest certain legal consequences thereof.

■ Monk's heirs sought to maintain their suit against Dearborn for negligence and unseaworthiness under the general maritime law and the Death on the High Seas Act, 46 U.S.C. §§ 761–768. Representatives of the deceased crew members added to these contentions a claim for negligence under the Jones Act, 46 U.S.C. § 688.[10] All four estates alleged that DOHSA and the general maritime law provide a federal cause of action against the platform defendants—C & K, DEI, and Chapman[11] —but, as we will explore later, there is a

question whether these claims fall within § 1333 of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., which prescribes the applicable law for the subsoil of the outer Continental Shelf and for artificial islands permanently affixed thereto. For the present we need only observe that the death claims against all defendants were properly in federal district court under either the Jones Act or DOHSA or fell within the Lands Act.[12]

There are two main issues—whether land law or admiralty law covers the claim of Monk against Dearborn, and whether manning and inspection requirements of federal statutes and regulations apply to the CARRYBACK. Determination of the second of these bears on the findings that Dearborn was negligent and the CARRYBACK unseaworthy, which in turn may affect, at least, limitation of liability, relative fault between the defendants, and the extent of Monk's comparative fault. Untangling these skeins and setting out various alternatives would require a catalogue of instructions to the District Court on remand that would be neither useful nor practical. We therefore decide the issues presented as best we can, vacate the judgment of the District Court, and remand for further proceedings.

### 1. Consolidation.

■■ A threshold question is whether the District Court correctly consolidated Dearborn's limitation petition, filed pursuant to 46 U.S.C. § 185, with the Armstrong death action for trial in Houston. District courts have broad discretion under Fed.R.Civ.P. 42(a) to

---

10. Seamen have alternative remedies against their employers under the Jones Act for negligence and DOHSA for unseaworthiness. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 396 n. 12, 90 S.Ct. 1772, 1785 n. 12, 26 L.Ed.2d 339, 354 n. 12 (1970); Doyle v. Albatross Tanker Corp., 367 F.2d 465 (CA2 1966).

11. Except, as already pointed out, Monk's heirs did not sue his employer, DEI.

12. The District Court found that general maritime law applied to the death actions, citing Moragne v. State Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which concerned a death in state waters. Whether *Moragne* applies on the high seas is an issue not yet decided by this court and not briefed by the parties, and we do not consider it.

consolidate causes pending in the same district. *See generally* 9 Wright & Miller, Federal Practice & Procedure § 2384, at 272 (1971). In this case there was no jurisdictional impediment to consolidation because both the Armstrong suit and the limitation proceeding independently invoked federal jurisdiction.[13] Since the actions presented common issues of law and fact, consolidation saved the parties from wasteful relitigation in disparate forums, avoided duplication of judicial effort, and did not prejudice Dearborn's right to prove entitlement to limitation. The District Court did not abuse its discretion in ordering consolidation.[14]

2. The governing law and Monk's contributory negligence.

The District Court found Dearborn, Chapman, and C & K jointly and severally liable for the death of Monk, DEI's supervisor. Monk was basically a platform worker, but he spent part of his time aboard the CARRYBACK, completing his work reports and using the ship's short-wave radio to communicate with DEI's shoreside office. He was on the CARRYBACK when the explosion occurred. The court found that Monk's inadequate supervision of platform operations contributed to his death to the extent of 25%. The District Court recognized that under *Rodrigue* Texas law applied to platform-based deaths and injuries, but reasoned that because Monk died at sea the claim for his death, as against all defendants, was within maritime jurisdiction. Accordingly it applied admiralty's beneficent doctrine of comparative negligence to permit recovery by the Monk heirs against Dearborn, Chapman and C & K, reduced by 25%.

■ Under Texas law contributory negligence is a bar to recovery in a negligence action. "The doctrine of comparative negligence, which apportions liability between the parties according to the relative degree of their negligence, does not exist in Texas, except by virtue of statute in actions between certain employers and their employees." 40 Tex. Jur. 2d Negligence § 97, at 602–03 (1962) (footnotes omitted).[15]

■ Chapman and C & K—the two platform defendants held liable on the Monk claim—vigorously urge that as against them Texas law controlled so that Monk's contributory negligence barred the claim for his death. For reasons discussed below we conclude that the land law of Texas, the surrogate law for the platform, does control as between these parties with the result that the Monk claim against C & K and Chapman is barred.[16]

---

13. Jurisdiction over Armstrong's suit was under the Death on the High Seas Act, 46 U.S.C. §§ 761–768, and the Jones Act, 46 U.S.C. § 688. Dearborn's limitation petition was properly in federal district court under 46 U.S.C. § 185.

14. With the unification of admiralty and civil procedure, suits in admiralty have even been consolidated with civil actions at law when the effect was to force issues in the admiralty action to be tried to a jury. See Blake v. Farrell Lines, Inc., 417 F.2d 264 (CA3 1969); 5 Moore, Federal Practice ¶ 42.02, at 41–11 to 42–13 (2d ed. 1971) (main volume and cumulative supplement).

15. Texas courts have applied the comparative negligence doctrine to suits for death in state territorial waters of *Sieracki* seamen. See Vassallo v. Nederl-Amerik Stoomv Maats Holland, 162 Tex. 52, 344 S.W.2d 421 (1961). *Vassallo* was a suit within maritime jurisdiction in which the Texas death stat-utes were borrowed to provide a vehicle for recovery, but the Texas court chose to apply substantive maritime principles. This borrowing was necessitated by The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886) [overruled in Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970)], which held that general maritime law did not permit recovery for wrongful death. For suits to which substantive principles of Texas law are applicable, however, contributory negligence has traditionally barred recovery.

Texas recently enacted a modified comparative negligence statute. Tex.Laws 1973, ch. 28, § 1, at 41. It applies only to causes of action arising after September 1, 1973.

16. We reject as meritless, without any necessity for discussion, the argument of the Monk heirs that C & K and Chapman did not adequately raise contributory negligence as an issue, and that if the District Court

The death claim for Monk, who perished about seventy-five feet downwind of the platform, presents a jurisdictional conflict between the Death on the High Seas Act and the Outer Continental Shelf Lands Act. DOHSA provides in pertinent part: "Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, . . . the personal representative . . . may maintain a suit for damages . . . in admiralty . . . ." 46 U.S.C. § 761.[17] The Lands Act extends the political jurisdiction of the United States "to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures . . . erected thereon," 43 U.S.C. § 1333(a)(1), and then provides in relevant part:

> To the extent that they are applicable and not inconsistent . . . with other Federal laws . . . the civil and criminal laws of each adjacent State as of August 7, 1953 are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

*Id.* at § 1333(a)(2).

In a line of decisions beginning with Pure Oil Co. v. Snipes, 293 F.2d 60 (CA5 1961), this circuit construed § 1333 of the Lands Act to make federal maritime law, as supplemented by state laws, applicable to injuries occurring on island-platforms on the outer Continental Shelf. See Loffland Bros. Co. v. Roberts, 386 F.2d 540 (CA5 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968); Ocean Drilling & Exp. Co. v. Berry Bros. Oilfield Serv., 377 F.2d 511 (CA5), cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118 (1967); Movible Offshore Co. v. Ousley, 346 F.2d 870 (CA5 1965). In Dore v. Link Belt Co., 391 F.2d 671 (CA5 1968), and Rodrigue v. Aetna Cas. & Sur. Co., 395 F.2d 216 (CA5 1968), we extended the rationale of *Pure Oil* to death claims so as to make them exclusively cognizable in admiralty under the Death on the High Seas Act. In *Rodrigue* plaintiff's decedent was killed when he fell from a derrick to the floor of the platform, and in *Dore* the worker had fallen to his death when the crane on which he was working toppled onto a barge moored below. The Supreme Court granted certiorari in both cases, consolidated them, and ruled that DOHSA did not apply. The Court then reasoned that since state law governed under § 1333 in the absence of inconsistent federal law, the nonapplicability of DOHSA allowed state law to apply as incorporated federal law. The case was accordingly reversed and remanded for further consideration.

The relevance of the *Rodrigue* decision to our case springs as much from its underlying rationale as from its result. The Court reasoned that under traditional jurisdictional principles maritime law is inapplicable to platform-based accidents,[18] but the more fundamental premise was that Congress did not intend by the Lands Act that these

---

erred in ruling on the effect of Monk's contributory negligence it was enticed into error by C & K and Chapman, who may not complain of it on appeal.

17. DOHSA has been construed to confer admiralty jurisdiction over claims arising out of airplane crashes on the high seas though the negligence alleged to have caused the crash occurred on land. See Stiles v. National Airlines, Inc., 161 F.Supp. 125 (E.D.La.1958), aff'd, 268 F.2d 400 (CA5), cert. denied, 361 U.S. 885, 80 S.Ct.

157, 4 L.Ed.2d 121 (1959); Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631 (CA8 1972); Noel v. Airponents, Inc., 169 F.Supp. 348 (D.N.J.1958). *See generally* Annot., 66 A.L.R.2d 1002 (1959).

18. The thesis for this argument was that the island-platforms were to be viewed as extensions of the subsoil, and that admiralty jurisdiction traditionally had not attached to extentions of land not erected as navigational aids. 395 U.S. at 359–361, 89 S.Ct. at 1839–1840, 23 L.Ed. at 366–367.

island-platforms be within admiralty's jurisdiction.

Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, the legislative history shows that Congress did not intend that result. First, Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply. The legislative history of the Lands Act makes it clear that these structures were to be treated as islands or as federal enclaves within a landlocked State, not as vessels.

395 U.S. at 361, 89 S.Ct. at 1840, 23 L. Ed.2d at 367.[19] One indication of Congress' intent to exclude island-platforms from admiralty jurisdiction was said to be the emphasis in the congressional debates and hearings on the close relationship between adjacent states and platform workers, who often commute regularly between land and platform. 395 U.S. at 363, 89 S.Ct. at 1841, 23 L.Ed.2d at 368. The Court also noted the theme underlying the legislative history that exploration and development of underground resources on the continent's submerged shelf lands was substantively a land-related activity and alien to the traditional interests of maritime law. *Id.* at 364–365, 89 S.Ct. at 1841–1842, 23 L. Ed.2d at 369.[20]

These concerns about the close relationships between platform workers and their adjacent states and about the nonmaritime character of platform operations indicate to us that Congress did not intend that application of state law necessarily should cease at the physical boundaries of the platform. The same concerns may be equally applicable to accidents fortuitously consummated in the surrounding sea. While Monk's death occurred on the high seas, there is little to choose between his relationship to the adjacent state and those of his fellow platform workers. He was by all standards a platform worker. The time he spent aboard the CARRYBACK was primarily in pursuit of such platform-related duties as filling out work reports and communicating with his shoreside office. Also, his claim against C & K and Chapman rests on the theory that they performed the renovation project on the platform in an unreasonably unsafe manner, and, as *Rodrigue* teaches, Congress felt that accidents caused by such operations were more significantly tied to the interests of the adjacent state than to the admiralty's interest in maritime commerce.

Post-*Rodrigue* case law in this circuit supports a view that Congress intended by § 1333 to extend the law of the adjacent state to claims such as the one in issue. Twice we have found maritime law inapplicable to claims by platform workers pushed into surrounding seas by platform-based equipment, even though substantial injuries may have been physically caused by the water itself. See Bible v. Chevron Oil Co., 460 F.2d 1218 (CA5), cert. denied, 409 U.S. 984, 93 S.Ct. 325, 35 L.Ed.2d 248 (1972); Bertrand v. Forest Corp., 441 F.2d 809 (CA5), cert. denied, 404 U.S.

---

19. At least in methodology this court and the Supreme Court found common ground. In Pure Oil Co. v. Snipes, 293 F.2d 60 (CA5 1961), we had stated:

"If [state] law is to apply, it is because Congress has specified that this is so.

\*    \*    \*    \*    \*

[W]e are not confronted with the question whether Congress would have the constitutional power to declare as to these offshore activities that for an essentially maritime matter a nonmaritime standard is to be followed. At most, we have a question whether Congress may treat an occurrence in this new geographical area

as substantially maritime even though on traditional lines an event taking place on a structure fixed permanently to the bed of the water might be regarded as nonmaritime."

*Id.* at 64.

20. The Court quoted the testimony of an admiralty expert given at the congressional hearings that "[M]aritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose." 395 U.S. at 365 n. 12, 89 S.Ct. at 1842 n. 12, 23 L.Ed.2d at 369 n. 12.

863, 92 S.Ct. 106, 30 L.Ed.2d 107 (1971). In *Rodrigue* itself one of the decedents was killed when he fell onto a barge moored next to the platform. The distinction between the suitors in these cases and one in the position of Monk, fortuitously positioned at sea at the time of explosion, is at best elusive. We might say that in the earlier post-*Rodrigue* cases a tort originating on the platform cast its victims into the sea, whereas in Monk's case the tort travelled for approximately seventy-five feet across the water to find its victim, but it seems illogical to assume that Congress would have grounded the choice between maritime and state law on a distinction so lacking in substance.

Other developments in the law of admiralty jurisdiction point toward treating Monk's claim against the platform defendants as under the law of the adjacent state. Historically maritime jurisdiction has been measured by the locality of the wrong [21] with locality defined as where the "substance and consummation of the injury" took place. The Plymouth, 70 U.S. (3 Wall.) 20, 33, 18 L.Ed. 125, 127 (1886).[22] But as the Supreme Court recently noted in Executive Jet Aviation v. Cleveland, 409 U.S. 249, 261, 93 S.Ct. 493, 501, 34 L.Ed.2d 454, 463 (1972), increasingly there have been legislative and judicial rejections of strict locality as the sole test of jurisdiction. A seaman, for example, can recover under the Jones Act for injuries suffered in the course of the ship's service, whether on land or sea. In his case "[a]dmiralty jurisdiction over the suit depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters." O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 42–43, 63 S.Ct. 488, 492, 87 L.Ed. 596, 602 (1943). *Accord,* Kelly v. Smith, 485 F. 2d 520 (CA5), cert. denied sub nom. Chicot Land Co. v. Kelly, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); Kimble v. Noble Drilling Corp., 416 F.2d 847 (CA5 1969), cert. denied, 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970).[23]

And in 1948 Congress moved admiralty jurisdiction shoreward with the Extension of Admiralty Act, 46 U.S.C. § 740, which provides that maritime jurisdiction shall include cases of damage "caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." This statute applies to give admiralty jurisdiction over pierside injuries caused by the vessel's hull, gear, or cargo. See Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), explained in Victory Carriers, Inc. v. Law, 404 U.S. 202, 209–210, 92 S.Ct. 418, 423–424, 30 L.Ed.2d 383, 390 (1971).

Several courts have recently declined to uphold admiralty jurisdiction over accidents consummated in state territorial waters but lacking a significant maritime connection. In Peytavin v. Govern-

---

21. *See generally* discussions in Watz v. Zapata Off-Shore Co., 431 F.2d 100, 109–111 (CA5 1970); Peytavin v. Government Employees Ins. Co., 453 F.2d 1121 (CA5 1972); 7A Moore, Federal Practice ¶ .325 [3] (2d ed. 1972); Black, Admiralty Jurisdiction: Critique and Suggestions, 50 Col.L.Rev. 259 (1950).

22. This strict locality test is so mechanical in operation that at times it has made maritime jurisdiction depend on the direction from which plaintiff fell, landward or seaward. *Compare* T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928) [longshoreman knocked from wharf staging into water by sling being lowered from vessel; state law applicable], *with* Minnie v. Port Huron Term. Co., 295 U.S. 647, 55 S.Ct. 884, 79 L.Ed. 1631 (1935) [longshoreman knocked by hoist from vessel onto adjacent wharf; federal law applicable].

23. A seaman's right to maintenance and cure is similarly unbounded by locality. Gilmore & Black, Law of Admiralty §§ 6–6 to 6–9 (1957). For suits on a contract, maritime relationship, not locality, has always determined jurisdiction. DeLovio v. Boit, 7 F. Cas. pp. 418, 444 (No. 3,776) (CCD Mass. 1815); Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).

ment Employees Ins. Co., 453 F.2d 1121 (CA5 1972), plaintiff, while parked on a floating pontoon waiting to board a ferry, was involved in a rearend collision. He sued in admiralty for resulting whiplash and back injuries. The court rejected strict locality as the sole test of jurisdiction because of its failure "to provide any clear guidance," *id.* at 1126, and focused instead on the connection of the claim to traditional maritime activities or interests. Since maritime connection was lacking in the relationship between the parties, in the nature of the alleged negligence (failure to keep an automobile under control and to maintain a proper lookout), and in the nature of injuries (whiplash), the court dismissed the suit. In *Executive Jet* plaintiff's plane had suffered a power loss from ingesting seagulls into its engines on taking off from defendant's airport and finally had settled into Lake Erie just off the end of the runway, where it sank and became a total loss. Plaintiff sued in admiralty for property damages, alleging that defendant negligently failed to keep its runway free of seagulls or to warn of their presence, but the Court dismissed for lack of jurisdiction.

> [T]he mere fact that the alleged wrong "occurs" or is "located" on or over navigable waters—whatever that means in an aviation context—is not itself sufficient to turn an airplane negligence case into a "maritime tort." It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.

*Id.* 409 U.S. at 268, 93 S.Ct. at 504, 34 L.Ed.2d at 467.[24]

The emphasis on maritime connection as a prerequisite to admiralty jurisdiction—typified by the Supreme Court's opinion in *Executive Jet* and by *Peytavin* in this circuit—is an additional reason for holding DOHSA inapplicable to the Monk death claim. Monk was a platform worker. He was aboard the CARRYBACK for the purpose of performing duties directly related to platform operations, the physical cause of his death was the platform explosion, and his cause of action against the platform defendants is based on negligent performance of platform operations. Under the teaching of *Rodrigue* these factors exemplify a more significant connection with the adjacent state than with admiralty.

Re Motor Ship Pacific Carrier, 489 F.2d 152 (CA5 1974), cert. denied, Union Camp Corp. v. Gypsum Carrier, Inc., 417 U.S. 931, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974), is not inconsistent with our conclusion. In that case the tort was the emission from a plant located on the bank of a navigable stream of fumes, smoke and gases which blew across the channel and engulfed a ship under way. The vessel, with visibility lost, collided with a bridge. Emphasizing substantial maritime connections, rejecting a strict locality test, and relying upon *Executive Jet* and our decisions in *Peytavin* and *Kelly*, we held that the ship's claim against the plant was within admiralty jurisdiction. As in *Kelly*, where the cause of injury was gunfire from shore, the landbased origin of the wrong consummated on the sea did not avoid admiralty jurisdiction. *Pacific Carrier* would be more nearly comparable to the case before us if the claim asserted against the plant had been that of the plant superintendent, aboard the vessel as neither crewman nor as passenger in the usual sense but using the vessel to perform plant-related duties at the time

---

24. Other cases often cited as representing a trend away from the strict locality test are Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914) ; Watz v. Zapata Off-Shore Co., 431 F.2d 100 (CA5 1970) ; Chapman v. City of Grosse Pointe Farms, 385 F.2d 962 (CA6 1967) ; McGuire v. City of New York, 192 F.Supp. 866 (S.D.N.Y.1961).

vision was obscured by smoke and fumes created in part by his landbased lack of care.

We conclude that § 1333(a)(2) of the Lands Act, when read against the background of legislative history outlined in *Rodrigue* and the increasing judicial and legislative dissatisfaction with strict locality as the sole test of jurisdiction, precludes us from treating Monk's claim against C & K and Chapman as a suit in admiralty. Accordingly the Texas doctrine of contributory negligence bars recovery by Monk's heirs from C & K and Chapman.[25]

Dearborn has not claimed the benefit of the Texas contributory negligence bar, and correctly so. Suits by landsmen injured aboard ship in navigable waters have traditionally been within maritime jurisdiction. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). Moreover, Dearborn's situation is different from that of the platform defendants whose breaches of duty were platform-related, while Dearborn's concurring breaches were admiralty-related. As between platform defendants and Monk, the only nexus with admiralty was Monk's presence aboard the vessel.[26] In this context it is consistent with the rationale of *Rodrigue* and the teachings of *Executive Jet* and *Peytavin* that the surrogate law of the platform controls the controversy. In the context of Monk versus Dearborn, however, the interest of admiralty intervenes because the risks to which Monk was exposed by Dearborn, and Dearborn's breaches thereof, were admiralty-related, concerning the duty of the vessel to those aboard her. Under the former "locality" test for determining admiralty jurisdiction, if Monk were a dock worker who, on like facts and with like consequences, had left the dock and gone aboard the CARRYBACK tied up nearby, his claim would have been in admiralty. After *Executive Jet*, *Peytavin* and *Kelly* the result would be the same, since there would be involved both locality and the relationship to admiralty previously recognized in *Kermarec*. As *Rodrigue* points out, the platform is like a pier. *Rodrigue* did not, by making land law the surrogate law of the platform, give it greater application off the platform in an admiralty-related situation than the land law would have off the pier in like circumstances. The interests vindicated in *Rodrigue* were, first, the status of the platform worker as land-related, and, second, the interest of the state in the process of extracting

25. *Rodrigue* must be read against the background of § 1333(a)(2), the section that extends state law to the artificial islands and that forms the basis of the *Rodrigue* decision. Section 1333(b) is cast in broader terms:

"The United States district courts shall have original jurisdiction of cases and controversies arising out of or in connection with any operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing or transporting by pipeline the natural resources, or involving rights to the natural resources . . . ."

An argument could be made that this subsection, read in conjunction with subsection (a)(2), at once prescribes jurisdiction and makes state laws applicable to "cases and controversies arising out of or in connection with any operations conducted on the outer Continental Shelf." Our interpretation of *Rodrigue* rejects this construction. The premise of *Rodrigue* is that DOHSA does not apply to platform-based injuries, and its nonapplicability opens the door for state laws. The question whether DOHSA applies to injuries occurring on the high seas around the platform, and thus ousts inconsistent state laws, cannot be answered by the "in connection with" test of subsection (b). This much is implicit in Kimble v. Noble Drilling Corp., 416 F.2d 847 (CA5 1969), cert. denied, 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970), in which we permitted a seaman to sue his employer under the Jones Act for injuries sustained on a stationary platform. His status as seaman, we explained, was sufficient to invoke the jurisdiction of the Jones Act even though his injury was in connection with platform operations.

26. The CARRYBACK's crew members possessed a maritime status and were killed in the performance of distinctively maritime work.

minerals from the soil and its particular capacity to deal with that subject matter as against admiralty's incapacity. Here there are also present matters which admiralty is particularly adapted to handle and land law is not. Admiralty's jurisdiction over the Monk claim against Dearborn is not ousted.[27]

### 3. Dearborn's liability.

#### a. Negligence.

■ The District Court ruled that Dearborn breached a legal duty owing to Monk because its skipper, Armstrong, was negligent in mooring his ship with a seventy-five foot rope to the platform's leeward side, which negligence was causally related to deaths of the crew and of Monk. The District Court found that "[t]he master knew or must, in law, be charged with knowing that the platform was a deteriorated oil storage platform and that welding was being done on the platform, for he carried the equipment for the welding operations to the platform on his boat," and that "Mr. Armstrong, the master, knew or should have known of the hazardous proximity of his boat to potential fires and possible explosion by the fact that he had, at an earlier date, helped to put out a fire on this platform during these repair operations." 340 F.Supp. at 1245. These rulings are adequately supported by the record and are affirmed.

■ The maritime duty of the shipowner to Monk, that owing to a nonseaman "on board for purposes not inimical to . . . legitimate interests [of the shipowner]," is not one of furnishing a seaworthy hull and appliances without regard to fault, but one of "exercising reasonable care under the circumstances." Kermarec v. Compagnie Generale Transatlantique, *supra;* The Admiral Peoples, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935); Leathers v. Blessing, 105 U.S. 626, 26 L.Ed. 1192 (1882).

As the District Court noted, the CARRYBACK's master had transported the welding machines to the platform, so he knew that hot work was being conducted around the tanks. Ray, the DEI supervisor prior to Monk's assumption of duties, testified that Armstrong knew of the presence of oil in the tanks and that he knew an oilsoaked board had caught fire a few days before the May 28 explosion. Also, in response to the question, "Did you at any time tell Captain Armstrong, where you got your boat tied up on a short tether, 'You've got a tank up there with hundreds of barrels of oil in it right above your head,'" Ray answered, "Yes, sir." The master, rather than taking steps to avoid the risk of possible

27. Our analysis has been in jurisdictional terms though the question presented was not whether the District Court had jurisdiction, but whether once having acquired jurisdiction it should apply Texas or maritime law. Choice of law questions raised in a maritime context have traditionally been analyzed in jurisdictional terms, however, because as a general rule "[o]nce admiralty jurisdiction is established, then all of the substantive rules and precepts peculiar to the law of the sea become applicable." Branch v. Schumann, 445 F.2d 175, 178 (CA5 1971). *Accord,* Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550, 553 (1959); King v. Alaska S.S. Co., 431 F.2d 994, 996 (CA9 1970). *But cf.* Watz v. Zapata Off-Shore Co., 431 F.2d 1001, 112 (CA5 1970), explained in 7A Moore, Federal Practice ¶ .325 [1], at 3502 n. 3 (Supp.1972). In many respects the difference between our framing the inquiry in jurisdictional or choice of law terms is purely semantical. Relationship of the tort to the forum state is fundamental to choice of law analysis, Restatement 2d, Conflict of Laws §§ 6, 145 (1971), and *Executive Jet* has now made clear that the degree of maritime relationship may also influence the jurisdictional issue. Occasionally admiralty borrows state law or uses it for analogies in formulating substantive maritime principles. *See, e. g.,* The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46 (CA5 1967), cert. denied, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968); Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); S. S. Philippine Jose Abad Santos v. Bannister, 335 F.2d 595 (CA5 1964).

fire or explosion, enhanced it by mooring his boat in such a position that the prevailing winds would tend to carry any ensuing flames over his vessel,[28] subjecting those aboard to risk of death or injury in the event an explosion or a fire occurred. Additionally, there was testimony that part of the CARRYBACK's function was to evacuate people from the platform in the event of emergency and that a vessel performing such function customarily held off sufficiently from the platform that she would not expose herself to the same danger from which she might be called on to save others.[29]

There was evidence that there were alternatives to tying up on a short line downwind of the platform when the vessel was not engaged in unloading or taking on men. The testimony showed that the CARRYBACK could have dropped a mooring buoy several hundred feet upwind and tied up to it, or could have tied up to the platform, as she did, but with a rope long enough to take her out of the shadows of the oil filled tanks.

Dearborn's reliance upon the "safe berth" cases[30] as exonerating the CARRYBACK is misplaced. This argument is *sub silentio* an attack on the finding that the master was negligent in mooring where he did. The "safe berth" cases relate to the duty of a wharfinger (or another who invites or directs a vessel to use his berth or dock) to use reasonable diligence to avoid damage to the vessel. They do not exonerate the master from his own duty to moor the vessel in a safe location. Joe Eddie Dyer, the officer of Dearborn who handled arrangements with DEI for the use of the vessel, testified:

Q. Now, would it be true that Captain Armstrong was in command of the vessel "CARRYBACK" at all times?

A. Yes.

Q. And is it true that under your working arrangement, that Captain Armstrong would have had ultimate authority to have prevented that vessel from being moored or docked at any point that he felt was dangerous?

A. Yes.

Q. You did not—the captain, in his command, did not release any of his authority over the safety of the vessel to anyone else, any client or anyone else, did he?

A. No.

Q. Is it true that the primary responsibility of the master of a vessel is to first look to the safety of the vessel and its crew?

A. Yes.

Q. So as to maintain it operable at all costs?

A. Yes, sir.

Dearborn is also wide of the mark with its argument that while some risk of explosion might have been foreseeable, no reasonable man could expect Monk and the Chapman personnel to weld a line leading directly into the oil-filled tanks.

Foreseeability does not mean that the precise hazard or the exact consequences which were encountered

---

28. At the time of year the prevailing winds were generally from the southeast.

29. Dearborn's managing officer was familiar with the Manual for Offshore Operations, published November 23, 1967 by the Offshore Operators Committee. While the Manual does not specifically refer to unmanned collection and storage platforms on which work is taking place, it suggests that drilling units be attended by a standby vessel to assist personnel in the event of an emergency. *Id.* § VIII(1). The managing officer acknowledged that CARRYBACK was serving as a standby vessel for the C & K platform. The Manual also states that the "prime purpose of the attending vessel [is] to save endangered lives if a possibility exists to save them." *Id.* § VIII(4). Some of the workers from this platform perished in the sea.

30. *E. g.*, Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1899); Campbell v. Wetherill, 130 F. 213 (E.D.Pa.1904); Look v. Portsmouth, K & Y St. Ry., 141 F. 182 (D.Me.1905); Canton Co. v. Brown, 299 F. 147 (CA4 1924).

should have been foreseen. Upon this all are agreed . . . . "[W]hen it is found that a man ought to have foreseen in a general way consequences of a certain kind, it will not avail him to say that he could not foresee the precise course of the full extent of the consequences, being of that kind, which in fact happened." Harper & James, Law of Torts § 20.05, at 1147 (1956), quoting Pollock, Liability for Consequences, 38 L.Q.Rev. 165, 167 (1922). *Accord*, Restatement 2d, Torts § 435. In this case the precise occurrence was well within the zone of the risk that hot work on the platform would trigger an explosion.

■ We also reject Dearborn's contention that the CARRYBACK, by being moored too close to the platform, merely created a condition on which intervening negligent forces of others acted and was not itself a proximate cause of the deaths in issue. This theory of proximate causation, now almost universally rejected, in admiralty as elsewhere, is an argument "grow[ing] out of the discredited notion that only the last wrongful act can be a cause—a notion as faulty in logic as it is wanting in fairness." In re Kinsman Transit Co., 338 F.2d 708, 719 (CA2 1964), cert. denied sub nom. Continental Grain Co. v. City of Buffalo, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965). The correct rule is that actionable negligence may consist of failure to take precautions against foreseeable acts of third persons, and this rule applies though the conduct of the third person is itself negligent. Restatement 2d, Torts §§ 302, 302A; Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge, 424 F.2d 684, 689 (CA 5), cert. denied sub nom. Ocean Drilling & Exp. Co. v. Signal Oil & Gas Co., 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); Horton & Horton, Inc. v. T/S J. E. Dyer, 428 F.2d 1131 (CA5 1970), cert. denied, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971); Harper & James, Law of Torts § 20.05, at 1144 n. 34 (1956). *See also* Restatement 2d, Torts § 449.

The conclusion that Dearborn was negligent must be affirmed. Dearborn urges that if the manning and inspection requirements discussed in part b, immediately following, are inapplicable to the CARRYBACK, its only remaining negligence is that attributable to it from Captain Armstrong's own actions in mooring too close to the platform, and in that event, Dearborn asserts, the Armstrong claimants cannot recover against Dearborn on negligence grounds. This contention is for the District Court on remand.

### b. Unseaworthiness.

We are unable to affirm the finding that CARRYBACK was unseaworthy. The District Court's conclusions that the vessel violated manning and inspection requirements imposed by statute(s) and regulations are central to the unseaworthiness question, and (as noted in the last sentence of part a, just above) also relate to the question of Dearborn's negligence. For reasons which follow, that issue must be reconsidered by the District Court. Additionally the unseaworthiness issue spills over to the question of limitation of liability, part 9, *infra*.

As we construe the opinion of the District Court, the CARRYBACK was found unseaworthy for at least three partially overlapping reasons: (1) She did not have a competent crew. This includes subsidiary findings that she did not have a licensed pilot required for passenger-carrying vessels as referred to in 46 U.S.C. § 404 and that Captain Armstrong was not a licensed master. Possibly it also includes a finding that independently of failure to comply with a licensing requirement Armstrong was an incompetent master, because he lacked knowledge of where the vessel should be moored in relation to the platform and because he moored close to the platform with actual knowledge that small fires already had occurred on the platform and knowledge (actual or chargeable) of the welding being done

on the platform.[31] (2) The vessel did not have a certificate of inspection. (3) There was a "congeries" of conditions creating unseaworthiness,[32] including: (a) the method of mooring the boat under the circumstances of the obviously deteriorated state of the platform; (b) placing in charge a master who did not have the competence to know to moor farther out from the platform or to request or recommend a mooring buoy that would permit such safer mooring; (c) failure to be equipped with a mooring buoy.

We turn first to the manning and inspection requirements. The physical dimensions of the CARRYBACK, 85 feet in length and 136 gross tons, were within the language of 46 U.S.C. § 404, but Dearborn insists this section has no application to her because she was not a vessel "carrying passengers for hire" within the meaning of that section. The section provides in pertinent part:

The hulls and boilers of every ferryboat, canal boat, yacht or other small craft of like character propelled by steam, shall be inspected under the provisions of this title. Such other provisions of law for the better security of life as may be applicable to such vessels shall, by the regulations of the Secretary of the department in which the Coast Guard is operating, also be required to be complied with before a certificate of inspection shall be granted, and no such vessel shall be navigated without a licensed engineer and a licensed pilot: *Provided,* That in open steam launches of ten gross tons and under, one person, if duly qualified, may serve in the double capacity of pilot and engineer. All vessels of above fifteen gross tons carrying freight for hire and *all vessels of above fifteen gross tons and in excess of sixty-five feet in length carrying passengers for hire,* but not engaged in fishing as a regular business, propelled by gas, fluid, naphtha, or electric motors, *shall be subject to all the provisions of this section* relating to the inspection of hulls and boilers and *requiring engineers and pilots,* and for any violation of the provisions of title 52 of the Revised Statutes applicable to such vessels, or of rules or regulations lawfully established thereunder, and to the extent to which such provisions of law and regulations are so applicable, the said vessels, their masters, officers, and owners shall be subject to the provisions of sections 494–498 of this title, relating to the imposition and enforcement of penalties and the enforcement of law. (emphasis added)

■ At trial Dearborn attempted unsuccessfully to develop a theory that it had made a bareboat charter of the boat to DEI which was engaged in transporting only its own employees. 46 U.S.C. § 390(a) defines "passenger" as "every person carried on board a passenger-carrying vessel," with certain exceptions. Sub-part (4) thereof excepts "any employee of the bareboat charterer." Dearborn reasoned that since there were no "passengers" carried, the vessel dropped out of the scope of § 404. See United States v. The Reefer King, 90 F. Supp. 236 (W.D.Wash.1950). This point has been abandoned on appeal, and wisely so.[33] But Dearborn claims that re-

---

31. And, though the court does not mention it at this point in its opinion, with actual knowledge, according to Roy's testimony, that there was oil in the tanks.

32. Citing Robinson v. Showa Kaiun K.K., 451 F.2d 688 (CA5 1971).

33. There was a total failure of proof that a bareboat charter was made. Dearborn's officer who handled the arrangements with DEI was firm in his testimony that a bareboat charter was not intended, that the arrangement by which Dearborn's boat, crew and master carried out the functions which we have described (for $350 per day plus consumables) was a temporary one until a bareboat charter could be worked out at a future time, and that the charter was never worked out. With no substantial factual predicate, Dearborn attempted at trial to bring itself within what witnesses described as standard practice employed by firms supplying boats and services to the offshore oil industry in the Gulf, pursuant to which

gardless of how the arrangement between it and DEI is characterized—whether as bareboat charter, time charter, or a contract to furnish services pursuant to which Dearborn undertook to transport passengers out to the platform and back [34]—§ 404 applies exclusively to what Dearborn terms "public conveyances" of passengers. While Dearborn nowhere sets out what it contends "public conveyances" includes, it urges that the term excludes an arrangement made by special contract between private parties for transportation of employees of a non-owner party, the very arrangement which it claims existed between it and DEI. We find the argument unpersuasive. First, to accept it would knock a giant hole in the regulatory scheme. Section 404 contains no such limitation. It does not state or suggest that Congress intended to exempt private arrangements like the one between Dearborn and DEI. Moreover, Coast Guard regulations define "carrying passengers for hire" as "[t]he carriage of any person or persons by a vessel for a valuable consideration, whether directly or indirectly flowing to the owner, charterer, operator, agent or any other person interested in the vessel." 46 CFR § 70.10–3. This interpretation, made by the enforcing agency and hence highly probative of the statute's true meaning, clearly negates the existence of the claimed exemption.

In The Jacob G. Neafie, 8 Ben. 251, 13 Fed.Cas. p. 266, No. 7,156 (E.D.N. Y.1875), a statutory penalty was sought against a steam tugboat navigating in New York harbor which had transported passengers without the certificate of inspection required of "every steam vessel carrying passengers" by then R.S. § 4417, now 46 U.S.C. § 391. The sufficiency of the libel was questioned on the ground the vessel was a tug boat not engaged in regular service as a carrier of passengers. To this the court responded:

The libel does, however, show that the vessel proceeded against on the 28th of November, 1874, received on board and carried passengers in the harbor and bay of New York, and it may fairly enough be considered to aver that on that day she was employed in the service of carrying passengers for fares as part of her business for that day. So understood, the libel is sufficient. The intention of the act is to compel every steam vessel, before engaging in the service of carrying passengers, to be inspected, with a view of ascertaining whether she may be used to transport passengers with safety to life. The necessity for inspecting exists, as well where the vessel engages in the business of carrying passengers for a single occasion and outside of her regular busi-

the supplier enters into two agreements, a bareboat charter of the vessel and a separate operating agreement (at times made by another legal entity) under which a crew is supplied. This is the "thin weight of paperwork" to which the District Judge referred as a device to avoid the safety requirements of § 404. 340 F.Supp. at 1243. But in this case no such arrangement was made. The trial judge's reference to "dummy corporations" arose from the fact that there were several corporations in the "Dearborn group" that were subsidiaries of a common parent and sharing the same officers, directors and quarters, and, that as part of its "bareboat charter" effort, Dearborn sought to spin out a theory that the boat was chartered by one subsidiary and the crew furnished by another. This effort foundered

along with the "bareboat charter" theory, and in the end Dearborn conceded that the several corporations were in effect a single entity.

With the case in this posture we need not rule on the effect *vel non* that an arm's length bareboat charter will have upon the safety requirements of 46 U.S.C. § 404. Compare 46 U.S.C. § 497 and the language of § 404 referring to §§ 494–498. Nor do we need to rule on the District Judge's statements concerning "paperwork" arrangements carried out through dummy corporations for the purpose of evading § 404.

34. The latter appears to be the characterization intended by District Judge Singleton in the decision below.

ness, as when her daily occupation is the carrying of passengers; and such a vessel should be held to be a vessel employed in the service of carrying passengers, within the meaning of section 4417. My conclusion, therefore, is, that the libel sufficiently states an offense, and that the exceptions must be overruled, with liberty to answer within one week.

13 Fed.Cas. at 267.

Second, the statutory history, a long and tortuous one, does not support the public conveyance-private contract distinction asserted by Dearborn. Section 404 derives from R.S. § 4426 and from an 1871 Act, 16 Stat. 456, requiring ferryboats, canal boats, yachts, or other small craft of like character propelled by steam, to have a certificate of inspection, and forbidding navigation without a licensed engineer and a licensed pilot. In 1896 Congress undertook to amend R.S. § 4426 to subject to regulation and inspection vessels generally referred to as launches or "naphtha launches" of over fifteen tons and carrying passengers or freight for hire.[35] There were two Congressional references to "ferry boats" as examples of vessels carrying passengers for hire,[36] but the major area of concern appeared to be differentiation between the vessels to be covered and vessels used for pleasure.[37] The proposed legislation was enacted in 1897, extending the § 4426 requirements of inspection and of pilots and engineers to "vessels of above fifteen tons burden, carrying freight or passengers for hire, propelled by gas, fluid, naphtha, or electric motors."[38] Additionally, the bill brought the newly covered vessels within the rules of the road. It would make little sense that vessels classified by size and method of propulsion and carrying passengers for compensation should be subject to the rules of the road if they were "public conveyances" but not subject if performing the same function by some private arrangement.

In 1905 Congress reenacted the 1897 provision for boats fifteen tons and over and added a penalty clause.[39] In 1906 an exclusion was added to § 4426 for fishing vessels.[40] If, as Dearborn contends, "vessels carrying passengers for hire" refers only to "public conveyances," it would not have been necessary to create a special exclusion for fishing vessels, which do not normally serve as "public conveyances."

The meaning of "passengers for hire" in § 404 is pointed up further by the Act of May 10, 1956.[41] By that Act Congress enacted what is now §§ 390–390g and amended § 404. The legislative background discloses a Congressional intent to require inspection and certification of certain small vessels carrying passengers and not theretofore covered by federal safety requirements. Several casualties, in which numerous passengers lost their lives aboard "small mechanically propelled passenger-carrying vessels for hire," see 1956 U.S.Code Cong. & Admin.News, pp. 2527, 2528, focused the legislators' attention on a gap in the regulatory scheme. The vessels on which the accidents occurred fell between § 404 (covering vessels of more than fifteen gross tons carrying [freight or] passengers for hire) and the Federal Motor Boat Act of 1940, 46 U.S.C. § 526 et seq. (since repealed in part) (covering pleasure craft). *Id.* at 2527. To fill this gap came the 1956 Act, providing in §§ 1–10, codified as 46 U.S.C. §§ 390–390g, for inspection and

---

**35.** See 28 Cong.Rec. 784, Jan. 20, 1896.

**36.** 28 Cong.Rec. 3915, Apr. 13, 1896; 28 Cong.Rec. 4846, May 5, 1896.

**37.** 28 Cong.Rec. 4846, *supra.*

**38.** Act of Jan. 18, 1897, 29 Stat. 489.

**39.** This was necessitated by a federal decision that while the 1897 legislation subjected vessels to inspection and the necessity for licensed officers it permitted no punishment of boats or masters for violations. See Annotation to 46 U.S.C.A. § 404.

**40.** See Annotation to 46 U.S.C.A. § 404; Act of May 16, 1906, 34 Stat. 193.

**41.** 70 Stat. 153.

certification of smaller passenger-carrying vessels. In no respect does the coverage of this broadened statutory system appear to be limited by the status of the vessel as a "common carrier" or "public conveyance." Rather, a line is drawn in terms of the status of the passenger, that is, whether he has or has not contributed consideration for his carriage. Sec. 1 of the Act, 46 U.S.C. § 390, defines passengers as all persons aboard a passenger-carrying vessel and then excepts from this category crew members who are paid for their services and have "contributed no consideration for their carriage" [sub-part (a)(2)]. It also excepts a guest aboard a pleasure vessel "who has not contributed any consideration, directly or indirectly, for his carriage" [sub-part (a)(5)]. The payment or lack of payment of consideration, direct or indirect, is the same distinction employed in the Coast Guard Regulation, 46 CFR 70.10–3. Sub-part (6) of Subsec. 1(a) of the Act, 46 U.S.C. § 390(a)(6), was added to exempt tugboats and towboats occasionally carrying more than six nonpaying guests for harbor and dock inspection trips. See 1956 U.S.Code Cong. & Admin.News p. 2530. No such exemption would have been necessary if the Act were to be limited to "public conveyances" of passengers, a category that hardly includes tugboats and towboats. It appears to have been intended that the new inspection and certification procedures under §§ 390–390g and those already existent under § 404 should together form an integrated regulatory scheme for small passenger-carrying vessels not under the Motorboat Act of 1940. It would be anomalous indeed if vessels falling under § 404 are limited to those serving as "public conveyances" while the smaller vessels under § 390 are not so limited.

The linking together of §§ 390–390g and § 404 is further demonstrated by the fact that sub-part 6(a) of the 1956 Act (which amended § 404) expressly dropped from coverage under § 404 certain small vessels—those over fifteen tons but sixty-five feet or less in length —in order that they could be included in § 390 coverage. See 1956 U.S.Code Cong. & Admin.News p. 2530. Additionally, the sections are linked by the provision in § 390 that its definitions are applicable to § 404 unless the context requires otherwise.

The only authority offered by Dearborn in support of its theory of the meaning in § 404 of "carrying passengers for hire" is language from Carlsen v. Paladini, 5 F.2d 387 (CA9 1925). The vessel in that case was a motorboat used to perform a contract to transport materials, supplies and equipment for a construction company. Employees of the construction company sought and obtained a free ride, and were hurt when steel cables linking the THREE SISTERS to a barge she was towing parted. The owner sought limitation of liability, and the injured persons opposed it on the ground the THREE SISTERS was carrying passengers without a certificate of inspection. The court held that the THREE SISTERS was not a passenger carrying vessel, giving several reasons. Neither the employer of the riders nor the riders paid any fare or the equivalent or had a contract for such payment; the owner had no contract with the employer to transport passengers; the boat was not a public conveyance, did not hold itself out as a common carrier, and her business was towing upon occasional engagements. These references to "common carrier" and "public conveyance" in the recital of reasons why the vessel was not a passenger carrying vessel are not authority that § 404 is limited to "common carriers" or "public conveyances." Dearborn's argument that the CARRYBACK was not within § 404 because, though fifteen miles from shore, between a trip out and a trip back, it was tied up at the moment of explosion and hence not being "navigated", is frivolous. United States v. Monstad, 134 F.2d 986 (CA9 1943); Carr v. Hermosa Amusement Corp., 137 F.2d 983 (CA9 1943), cert. denied, 321 U.S. 764, 64 S.Ct. 520, 88 L. Ed. 1060 (1944).

Summarizing, we reject Dearborn's theory that the CARRYBACK was not subject to § 404 because that section is limited to "public conveyances" of passengers, which does not include an arrangement by special contract between private parties to transport employees of the non-owner party, and we conclude that CARRYBACK was a vessel "carrying passengers for hire" as that term is used in § 404. Beyond that point we are unwilling to go. Without indicating any view on a decision one way or the other, we simply say that on what is before us we are unable to determine with any sense of assurance the extent, if any, to which manning and certification requirements apply to a vessel "carrying passengers for hire" as that term is employed in § 404.[42] The briefs give us little assistance. The District Court refers in most instances to the lack of a licensed master. Section 404 refers to a licensed pilot. The parties shift indiscriminately from one term to the other. Dearborn asserts, without citation of authority, that § 404 has no application in offshore waters, and that the licensing agency, the Coast Guard, does not require licensed pilots or certificates of inspection on small boats such as the CARRYBACK transporting passengers and material to offshore oil platforms. It makes a policy argument, without supporting evidence, that the offshore boat industry servicing offshore platforms in the Gulf operates without licensed pilots (and/or masters?) and will be thrown into chaos by judicial imposition of licensing and inspection rules not provided for by law or required in practice.

We will not embark "without a pilot, rudder, compass or radar—on an amateur's voyage on the fog-enshrouded sea"[43] of the manning and inspection statutes.[44] Ultimately the voyage may be short and uneventful, but that is not apparent to us.

Because the violations of the manning and inspection requirements were included in the conditions creating unseaworthiness on a "congeries" theory, it may be necessary for the District Court to reconsider its findings on that theory. Whether the "congeries" approach is correctly applicable we decline to decide at this time.

4. Chapman's liability.

Chapman was found liable under the doctrine of respondeat superior for the negligence of Scanlan, one of its pushers. As the District Court reconstructed the events, Monk had instructed Scanlan to remove a valve from the equalizer line. Scanlan's workmen were unable to remove it with wrenches, so Overly, Chapman's jobsite superintendent, instructed them to cut it out with a pipecutter, which they did. Scanlan then told Monk that he was going to weld the line, now in two pieces. Though Monk assumed that the pipe was to be removed from the tank and carried to the side to be welded, Scanlan directed Gaspard to weld it in place. The District Court concluded that Scanlan was negligent in failing to check for the presence of oil in the tanks and in failing to inquire of Monk in greater detail about the desirability of welding the line in place, and Chapman does not contest this conclusion. The question on which the parties have joined issue is whether

42. For starters, see 46 U.S.C. §§ 404(a), 372, 375, 390, 390a–390d, 391, 392, 400, 402, 414, 416, 435, 436, 451–453, 460–462, 463a, 472, 491, 497, and 46 C.F.R. Subchapter H.

43. Frank, J., concurring in United States v. Flores-Rodriguez, 237 F.2d 405, 412 (CA2 1956).

44. There are other questions lurking in the wings. Is there evidence of any lack of qualification by Armstrong, other than his improperly mooring the boat, and can improper mooring by a crew member not shown to be otherwise incompetent constitute unseaworthiness? To constitute unseaworthiness based upon an incompetent crew, was Dearborn required to have, and did it have, knowledge of Armstrong's incompetency? If CARRYBACK was not unseaworthy and Armstrong's only viable claim against Dearborn is in negligence, is the only negligence of Dearborn that imputed from Armstrong or is there an additional periphery of Dearborn negligence?

at the time of the explosion Scanlan was Chapman's employee or whether he was exclusively DEI's borrowed employee. *See generally* Restatement 2d, Agency §§ 219, 220 (1958). At stake is Chapman's liability to the captain and crew members of the CARRYBACK, which the litigants treat as governed by federal law.[45] Nevertheless, all parties rely on both Texas and federal cases, and we find the former helpful by analogy. The result is the same under either body of law.

Without doubt the platform workers were chapman's general employees. It carried them on its payroll, withheld their income taxes and contributions to F.I.C.A., and carried workmen's compensation and liability insurance. Under Texas law, however, the negligence of such general employees is not to be imputed to the general employer if for a specific job the employee has relinquished to another temporary employer exclusive control over the employee. T. G. & M. Drilling Co. v. Kersh, 295 S.W.2d 466 (Tex.Civ.App. 1956, no writ); Magnolia Pet. Co. v. Francis, 169 S.W.2d 286 (Tex.Civ.App. 1943, writ ref'd), and the same is true under federal law, Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909). The burden is on Chapman as the putative employer to show that Scanlan was not its employee. The original employment relationship is presumed to continue unless the temporary employer's control over the worker is so pervasive as to be inconsistent with that presumption. *See* Kiff v. Travelers Ins. Co., 402 F.2d 129 (CA5 1968); Producers Chem. Co. v. McKay, 366 S.W.2d 220 (Tex.1963); Restatement 2d, Agency § 227, comment b. Factors helpful in deciding whether a new employment relationship has replaced the old are the extent of the temporary employer's control over details of work, his furnishing of the necessary tools, his right to discharge the employees, and his obligations for payment. *See* Ruiz v. Shell Oil Co., 413 F.2d 310 (CA5 1969); Restatement 2d, Agency § 220. Agreements among the parties assigning the responsibility for supervising the worker are additional guides. *Compare* Magnolia Pet. Co. v. Francis, *supra*. Also, liability under respondeat superior has generally been imposed on the putative employer who has represented his worker as possessed of a certain skill if actionable negligence has occurred in the exercise of that skill.[46]

The evidence amply supports the District Court's conclusion that Chapman did not cede to DEI sufficient control of its employees to relieve it of responsibility for their torts. The oral understanding between the parties was that Chapman would provide equipment and a skilled crew of welders, pipefitters, and sandblasters who would be supervised by Chapman personnel—Chapman's crew superintendent (Overly), and three Chapman pushers, one of whom was Scanlan. Williams, president of DEI, testified that "we wanted some people that were skilled craftsmen that could—that had the practical knowledge of how to hook lines up and follow through with the job." Monk, DEI's engineer, generally supervised all platform

---

45. We have already held in part 2, *supra*, that any liability of Chapman to Monk's heirs is barred by Monk's contributory negligence under the applicable Texas law. Chapman makes no claim that its liability for the death of Captain Armstrong, who was found guilty of contributory fault, must be determined under Texas law. The two crewmen on the CARRYBACK were guilty of no contributory fault. Chapman does not raise as an issue on appeal the correctness of the ruling that it, C & K, DEI and Dearborn were liable for the property damage to

the CARRYBACK diminished under admiralty principles by Dearborn's percentage of comparative fault.

46. *Compare* Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909); Producers Chem. Co. v. McKay, 366 S.W.2d 220 (Tex.1963); Dugas v. Pelican Constr. Co., 481 F.2d 773 (CA5 1973); Herndon v. Halliburton Oil Well Cementing Co., 154 S.W.2d 163 (Tex.Civ.App.1941, writ ref'd w. o. m.), *with* Hilgenberg v. Elam, 145 Tex. 437, 198 S.W.2d 94 (1946).

work, but responsibility for directing details of the welding and pipefitting was with Overly and the Chapman pushers. Monk was "there to show them the direction of the whole job, but not to sit there and show every man on that platform exactly what to do." Most importantly, the negligence of Scanlan imputed to Chapman occurred in the operational phase of the work. Monk had directed that a valve be removed, but Overly and Scanlan worked out the specific manner of removal and the subsequent welding. Thus Scanlan's negligence was in conducting a phase of the operation which Chapman had represented its workers competent to perform and over which Chapman personnel had retained a measure of control.

A case close in point is Producers Chem. Co. v. McKay, *supra.* Producers furnished an air compressor and an operator (McDonald) to Canadian River, a drilling contractor, for use in an air drilling project. Sears of Canadian River was responsible for telling McDonald where to connect his compressor and for instructing him when to start it, but McDonald remained responsible for its actual operation. While running the compressor McDonald negligently permitted compressed air and oil to mix in dangerous quantities, and an explosion occurred. The Texas Supreme Court, through Chief Justice Calvert, held that Producers was liable under respondeat superior for McDonald's negligence in operating the compressor. *See also* Aluminum Co. of America (ALCOA) v. Commercial Contracting Co., 438 S.W.2d 853 (Tex.Civ.App.1969, no writ); Herndon v. Halliburton Oil Well Cementing Co., 154 S.W.2d 163 (Tex.Civ. App.1941, writ ref'd w. o. m.). Federal cases of similar import are Standard Oil Co. v. Anderson, *supra,* in which a shipowner was held liable for its winchman's negligence in helping a stevedore to unload a vessel, and Dugas v. Pelican Constr. Co., 481 F.2d 773 (CA5 1973), in which this court held that a drilling contractor was not the borrowed employer of a roustabout furnished by a labor contractor.

As an independent ground for imposing liability on Chapman, the District Court found that its vice-president, Rick Chapman, negligently failed to warn his employees of the presence of oil in the tanks. Chapman denies that Rick Chapman knew of the oil, but the District Court found as a fact on adequate supporting evidence that Ray, a DEI engineer, warned Rick Chapman of the oil just four days before the explosion and told him, among other things, that working on the platform was like working on a bomb. Chapman's argument that Rick Chapman had no authority to warn his men, whom he knew would be welding around oil-filled tanks, disregards the District Court's conclusion, based on adequate evidence, that the exercise of reasonable care demanded no less.

We affirm the finding that Chapman was liable for negligence.

### 5. The Armstrong claim.

C & K, Chapman, DEI and Dearborn were held liable for the death of Captain Armstrong with 25% contributory fault. C & K and DEI have not contested their liability. Chapman has raised only the question of its negligence, and we affirm on that issue.

### 6. Love and Cassel.

C & K and DEI do not dispute their liability for the death of crewmen Love and Cassel. We have affirmed findings that Chapman was negligent and that Dearborn was negligent, although the extent of Dearborn's negligence is uncertain, and we have directed the District Court to reconsider unseaworthiness.

### 7. Property damage.

Only Dearborn has appealed from the District Court's rulings on damage to the CARRYBACK. It argues that the conduct of its employee, Armstrong, did not contribute to the destruction of the vessel, and that therefore its recovery from C & K, DEI and Chapman should not have been reduced by 25%. Our discussion in part 3a *supra* disposes of this point.

### 8. Indemnity.

At issue is distribution among C & K, DEI, Chapman and Dearborn of damages awarded three categories of claimants: (a) Love and Cassel, crew members aboard the CARRYBACK; (b) Armstrong, the master; and (c) Monk.

#### a. Love and Cassel.

Damages to the estates of Love and Cassel were divided equally among C & K, DEI, Chapman, and Dearborn.[47] Under the judgment each party was made liable for one-fourth of the award. Dearborn contends that it should have been awarded full indemnity from either C & K, DEI, or Chapman even though there was no contract of indemnity between Dearborn and any one of them.

■■■ Damages are sometimes shifted from one tortfeasor to another under the tort indemnity rule of Tri-State Oil Tool Indus., Inc. v. Delta Marine Drilling Co., 410 F.2d 178 (CA5 1969), which entitles a tortfeasor guilty of only "technical or passive" negligence to indemnity from a co-tortfeasor guilty of "active or affirmative" negligence.[48] It is unavailing to Dearborn, however, because the conduct on which its liability is based—i. e., improper mooring of the CARRYBACK— is not sufficiently different in kind or degree to be distinguished from the conduct of the other tortfeasors. They were all guilty of what may fairly be described as "active" misconduct.

■■■ The other theory of indemnity advanced by Dearborn derives from Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), in which a shipowner found liable to a longshoreman under the doctrine of unseaworthiness was allowed indemnity from the stevedore for breach of its warranty of workmanlike performance. Though the Supreme Court stressed the award was based on the "essence of the stevedoring contract," id. at 133, 76 S.Ct. at 237, 100 L.

Ed. at 142, we have extended it to the shipowner-ship repairer relationship, Lusich v. Bloomfield S.S. Co., 355 F.2d 770 (CA5 1966), and to a drilling barge owner-independent drill pipe contractor relationship, Whisenant v. Brewster-Bartle Offshore Co., 446 F.2d 394 (CA5 1971). In each of these cases a vessel owner entrusted control of his vessel to a contractor whose negligent acts made the owner liable for breach of his non-delegable duty to furnish seaworthy appliances. That kind of relationship is lacking between Dearborn and the platform defendants, and indemnity is accordingly unavailable in light of this court's persistent admonitions not "to extend [Ryan-type indemnity] beyond those controversies involving the 'special rules governing the obligations and liability of shipowners' which necessitated its formulation and justify its application." Ocean Drilling & Exp. Co. v. Berry Bros. Oilfield Serv., Inc., 377 F.2d 511, 513 (CA5), cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118 (1967). Accord, Smith Pet. Serv., Inc. v. Monsanto Chem. Co., 420 F.2d 1103, 1109–1111 (CA5 1970); Delta Engineering Corp. v. Scott, 322 F.2d 11 (CA5 1963), cert. denied, 377 U.S. 905, 84 S. Ct. 1164, 12 L.Ed.2d 176 (1964); Halliburton Co. v. Norton Drilling Co., 302 F.2d 431 (CA5 1962), cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963); Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge, 424 F.2d 684, 693 (CA5), cert. denied sub nom. Ocean Drilling & Exp. Co. v. Signal Oil & Gas Co., 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970). Loffland Bros. Co. v. Roberts, 386 F.2d 540, 549 (CA5 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968).

#### b. Armstrong.

The District Court ordered C & K, Chapman, and DEI to join in indemnifying Dearborn for the share of the Arm-

---

47. The District Court awarded C & K indemnity from DEI on the basis of a contractual provision. 340 F.Supp. at 1239. This award has not been appealed.

48. *See generally* Hodges, Contribution and Indemnity Among Tortfeasors, 26 Texas L. Rev. 151, 153–157 (1947); 41 Am.Jur.2d, Indemnity §§ 19–27 (1968).

strong award that it was required to pay. In view of the questions relating to Armstrong's right to recover from Dearborn and the basis thereof, the award of indemnity to Dearborn should be reconsidered.

### c. Monk.

The District Court shifted C & K's share of Monk's damages to Dearborn under a complex theory. Since C & K is relieved of liability to Monk, we need not review this point.

### 9. Limitation of liability.

The District Court judgment denied limitation of liability to Dearborn but without entering findings on privity or knowledge. On appeal the parties adverse to Dearborn on this issue focus upon the alleged failure to comply with the manning and inspection requirements discussed in section 3b, *supra*. Our disposition of that issue requires that the District Court reconsider the limitation question.[49]

### 10. Damages on the Monk claim.

■■ The court included in the damages to the Monk claimants a specific award of $25,000 for his pain and suffering. Assuming but without deciding that damages for pain and suffering were recoverable[50] the evidence is not sufficient to sustain an award. There was evidence that approximately fifteen minutes before the explosion Monk was within the interior of the vessel, and no one saw him alive thereafter. His body was found on the weather deck at the forepeak, the furthermost point of the vessel from the storage platform. Cassel's body was found in his bunk, Armstrong's body was found in the sea, and Love's body was never found.

On these facts the District Court concluded that Monk must have been within the vessel when the flaming ball fell on it and was not killed immediately but sought to find some way of escape, and for a period of several minutes until death overtook him at the forepeak suffered excruciatingly. The court found that the explosion and fire on the platform caused "a flaming ball . . . to fall as if it were an exploding bomb onto the *Carryback.*" The immediacy of the occurrence and the absence of other evidence make too speculative the finding that Monk survived for a matter of minutes and made his way to the forepeak.

### 11. Interest and attorney fees.

■ The court awarded $10,738.82 to Dearborn against C & K for services of boat and crew under the oral agreement for the period actually used but disallowed prejudgment interest. Under well-settled admiralty rules the allowance of prejudgment interest is discretionary. Williams v. United States, 443 F.2d 1151 (CA5 1971). The court disallowed such interest to all property damage, personal injury and death claimants, and additionally, there was confusion whether invoices should be sent to C & K or DEI. There was no error in disallowing interest on this particular claim.

■■ Dearborn complains of the refusal of attorney fees on the sum awarded for services of boat and crew, under Article 2226, Texas Civil Statutes. Assuming that this state statute would apply to an admiralty contract, the award of fees is discretionary under Texas law, Rampy v. Rampy, 432 S.W.2d 175 (Tex.Civ.App.1968), and the refusal to award was not error.

49. Dearborn's contention that CARRYBACK was not a seagoing vessel is frivolous. See 3 Benedict, Law of Admiralty, § 494 at 405–08 (6th ed. 1940).

50. On a theory that DOHSA did not preempt the separate remedy encompassed in state survival statutes that preserve in a decedent's estate the cause of action which up to the time of his death the decedent had for pain and suffering and would have been able to enforce had he survived, see Dugas v. National Aircraft Corp., 438 F.2d 1386 (CA3 1971), or on a theory based upon Dennis v. Central Gulf Steamship Corp., 453 F.2d 137 (CA5 1972), cert. denied, 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218, extended to offshore waters.

12. Relative fault and damages.

The extent of Dearborn's and Armstrong's fault is in question because of the manning and inspection and unseaworthiness issues. It is for the District Court, after determining these issues, to consider whether relative fault among the defendants, comparative fault of Armstrong, and division of responsibility for damages must be reconsidered and reallocated.

\* \* \*

Affirmed in part and reversed in part. The judgment of the District Court is vacated and the case is remanded for further proceedings not inconsistent with this opinion.